# McLEAN v. CLAPP.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 31. Argued October 15, 16, 1891. — Decided November 2, 1891.

*Grymes* v. *Sanders,* 93 U. S. 55, affirmed and applied to the point that where a party desires to rescind a contract upon the ground of mistake or fraud, he must, upon discovery of the facts, at once announce his purpose and adhere to it, and that if he be silent, and continue to treat the property as his own, he will be held to have waived the objection; and will be conclusively bound by the contract, as if the mistake or fraud had not occurred.

A holder of the legal title to real estate who has no equitable interest therein, cannot, by his act done without the knowledge or consent of the holder of the equitable title, who is in possession of and residing on the premises claiming title, rescind a completed settlement of a mortgage

debt on the premises so as to bind the holder of the equitable title, and prevent him from setting up defences which would otherwise be open to him.

IN EQUITY. Decree dismissing the bill. The plaintiffs appealed. The case is stated in the opinion.

*Mr. Edwin B. Smith* for appellants.

*Mr. Solomon H. Bethea* and *Mr. Sherwood Dixon* for appellees.

MR. JUSTICE BREWER delivered the opinion of the court.

In December, 1855, Edwin W. McLean, owning a store and stock of goods in Amboy, Illinois, sold the same to Ruggles W. Clapp, in payment for which he received four notes, amounting in the aggregate to five thousand nine hundred and eighteen and sixty-six one-hundredths dollars, drawing ten per cent interest, and secured by mortgage on four hundred and eighty acres of land. The first of these notes, for five hundred dollars, due in twenty-five days, was paid; the others were not. The last of the notes became due in May, 1857. Soon thereafter suit was commenced in the state court on them, and to foreclose the mortgage. In this suit the defence of usury was pleaded. A settlement was made with Clapp, in pursuance of which the three unpaid notes were surrendered; and in lieu thereof there was taken a draft for one thousand dollars, drawn on his brother, Alfred Clapp, of New York City; and eleven notes, five for two hundred dollars each, dated June 10, 1857, made by William Jones to Ruggles W. Clapp, three made by Cyrus Craig, November 29, 1856, to Ruggles W. Clapp, two for one thousand dollars each and one for fourteen hundred dollars; and three made by Curtis Cannon, August 1, 1857, to Ruggles W. Clapp, for four hundred and thirty-three and thirty-three one-hundredths dollars each. These notes were all endorsed "without recourse," and were nominally, at least, secured by conveyances of real estate. Also, to secure the draft, on which only $250 was ever paid, a conveyance was made of a lot and building in the

town of Amboy. There was no formal release of the mortgage; but the suit to foreclose was dismissed. This settlement was consummated some time in the latter part of 1857, or the fore part of 1858; and was consummated on the part of McLean by W. E. Ives, his attorney at Amboy, McLean himself having moved after the sale of the store to Great Barrington, Massachusetts, though it is claimed by the defendants that the terms of the settlement were agreed upon between McLean and Clapp in the summer of 1857, when McLean was on a visit to Amboy. In the summer of 1861 McLean, dissatisfied with the conduct of Ives as his attorney, discharged him and placed his business in the hands of one M. L. Arnold. While Arnold testified that in the same summer he notified Clapp that McLean repudiated the settlement, nothing was in fact done looking toward a repudiation until May, 1872, when this suit was commenced in the Circuit Court of the United States, by McLean, to set aside the settlement, and foreclose the mortgage, as though it still remained security for the original notes. Answers were filed, and some preliminary steps taken in the case during one year, and up to May, 1873. From that time no order was made or proceedings had in the case until July, 1882, when it was dismissed for want of prosecution. In the November following the order of dismissal was set aside and the case reinstated, and leave given to file a bill of revivor in the name of the widow and heirs of McLean, who had died in 1875. The case thereafter proceeded regularly till May, 1887, when, upon final hearing, the bill was dismissed.

The contentions of defendants are substantially — first, that McLean himself arranged the terms of the settlement of 1857; that he did this understandingly and without any fraud or misrepresentations on the part of Clapp, and hence cannot now repudiate it; secondly, that if he did not himself arrange such terms, he was in 1861 fully informed of the character and value of the paper and securities received by his agent in the settlement, and that with such full information he thereafter acquiesced in and ratified it; and, thirdly, that his laches and delay in asserting his rights forbid any recovery against

the present holders of the property conveyed by the original mortgage.

We notice only the second of these contentions. If the settlement by wHich the original notes were surrendered was made under such circumstances that McLean had a right to repudiate it, it was his duty to do so as soon as advised of all the circumstances justifying such repudiation; and he also must have repudiated it *in toto*. The settlement was a new contract between him and Clapp, and the law is clear that he cannot take the benefits of that contract and repudiate its burdens. The rule is thus stated by this court in the case of *Grymes* v. *Sanders,* 93 U. S. 55, 62 : " Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted. These remarks are peculiarly applicable to speculative property like that here in question, which is liable to large and constant fluctuations in value. *Thomas* v. *Bartow,* 48 N. Y. 200 ; *Flint* v. *Wood,* 9 Hare, 622 ; *Jennings* v. *Broughton,* 5 DeG. M. & G. 139 ; *Lloyd* v. *Brewster,* 4 Paige, 537 ; *Saratoga & S. R. R. Co.* v. *Rowe,* 24 Wend. 74 ; *Minturn* v. *Main,* 3 Seld. 220 ; 7 Rob. Prac. c. 25, sect. 2, p. 432 ; *Campbell* v. *Fleming,* 1 Ad. & El. 41 ; Sugd. Vend. (14th ed.) 335 ; *Diman* v. *Providence W. & B. R. R. Co.,* 5 R. I. 130."

If McLean did not himself arrange the terms of this settlement, if he was not at the time it was made fully informed of the character and value of the securities taken in exchange, he did become so fully informed in 1861, when he visited Amboy, and, discharging Ives, transferred his affairs to the control of Arnold. This appears distinctly from his own testimony. Now, if he desired to rescind his contract, his duty was at once to return what he had received, and repudiate wholly and forever the transaction. So far from doing this,

he did exactly the contrary; he retained all the notes and securities received under the settlement, and has never yet returned one of them. He took and held possession of all the real estate. As late as March 12, 1868, he conveyed a part of it to Cephas Clapp for eight hundred and fifty dollars. In November, 1867, he deeded to his agent Arnold another tract for one hundred and fifty dollars. It is true that Arnold testifies that he was to have this land to help him pay the expense of prosecuting this suit if unsuccessful, and that he was to hold it so as to tender it back to the defendants if successful. The letters, however, which accompanied this transaction indicate that it was an absolute sale, with no such conditions; and it appears, also, that a note of one hundred and fifty dollars was sent by Arnold to McLean in payment for the land. Further, he collected rent for the building in Amboy, which was conveyed to him as security for the draft, until it burned down in 1865. He also paid taxes on other tracts of land conveyed in this settlement, and collected rents therefrom — some rent being collected by Mr. Arnold for the benefit of the present complainants, as late as 1881 and 1882 — after McLean's death and the commencement of this suit. So even if we credit the testimony of his agent, that in 1861 he notified Clapp of an intent to rescind, (and Mr. Arnold's integrity as a witness is strongly impeached by many witnesses,) still the conduct of McLean in reference to the property for a series of years, long after 1861, is at variance with the idea of rescission, and was plainly a ratification of that settlement; and brings the case clearly within the rule laid down by this court, in the case just cited. He acted as owner, and assumed all the rights and burdens of ownership. He became owner only through that settlement. His conduct, after full knowledge, ratified and affirmed the settlement, and by it the original notes were paid, and the lien of the mortgage in fact discharged.

Were this all that appeared in the case, there would be nothing rising to the dignity of a question. But it is said, and this is the strong point made by the complainants in this respect, that in 1863 Ruggles W. Clapp consented to a rescis-

sion, and directed McLean to do just what he did in reference to this property; that at that time Lot Chadwick, the ancestor of those defendants who are making the contest, had acquired no interest in the realty, but the title stood as it did when the mortgage was given; that the mortgagor and mortgagee had a right to rescind that settlement, and authorize the latter to do just what he did with the property conveyed in the settlement without prejudice to the continuance of the lien of the mortgage; and that, as the latter was never in form released, Chadwick purchased with full notice. The consent of Ruggles W. Clapp to this arrangement is evidenced, as is claimed, by two letters, as follows:

"NEW YORK CITY, *May* 15*th*, 1863.

"M. L. ARNOLD, Amboy, Ill.

"*Dear Sir:* Your letter of 20th ult. is received and contents noted. About those notes and securities left in your hands by McLean you write that they are worthless or nearly so. I think something can be made off from them. You sell them and make the most you can; apply on mortgage I gave McLean. Any arrangement you can make with my brother Henry to compromise the matter will be satisfactory to me. I have some land in Whiteside County which I would like to let you have. I cannot now say when I will be in Amboy; will try and see you when I am there again. If you compromise the matter with Henry, have McLean release the mortgage from record.

"Yours truly,          R. W. CLAPP."

"FOUNTAIN HOTEL, EIGHTH STREET,

"BALTIMORE, MD. *June* 20*th*, 1863.

"M. L. ARNOLD.

"*Dear Sir:* Your favor of 10th inst. I received at Washington. In reply I would say that I wrote you from New York about the middle of last month, giving you full particulars how to proceed. I think it would be well to sell the Craig property, get the most you can, and apply on the McLean mortgage. The notes you say are worthless, or nearly so,

except what can be made off the Craig property. . I see no other way for you to do in the case but to make what you can out of the securities and apply on mortgage and fall back on the land to make up deficiency. I think it would be well for you to see my brother Henry again, and see if you can in any way effect a compromise. He has written to me recently stating that you had been to see him and had offered to settle for fifty cents on the dollar, but that you had effected no settle- ment, although he thought he would be able to do so. As I wrote in my last, do the best you can, and any compromise you can make with Henry will be satisfactory to me. I want the matter closed up.

"I remain respectfully yours, R. W. CLAPP."

It is urged by defendants that these letters were not written on the dates they bear, but long after Lot Chadwick had acquired his interest in the realty, and for the purposes of bolstering up this suit; and there is some reason to believe that their contention is correct. But we do not deem it necessary to rest upon this; and for reasons which will become apparent when other facts disclosed by the record are stated. Preliminary thereto it may be well to notice that these letters do not in terms either propose or assent to a rescission of the settlement. It is true that may be implied from the direction to sell the securities and apply on the mortgage; but each letter refers the matter of settlement to his brother Henry — suggests compromise with him — and in advance assents to any arrangement that may be made with Henry. If Ruggles W. Clapp were the only party interested in the property mortgaged, the letters might fairly be construed as a consent to the rescission and a reinstatement of full liability under the original mortgage; but the language is that of one who felt that he had no interest in the property, and was will- ing that the mortgagee should do whatever he could to secure full payment, with all the time a clear reference to his brother Henry as the party really interested. Now it appears from the record, that in 1852 or 1853 Henry Clapp bought these lands from the government — built a house thereon and en-

tered into occupation of them — and remained in open and notorious occupation of them until 1869, the time he sold them to Lot Chadwick. Because he was in some financial embarrassment, and because he had borrowed money of Edwin and Jason Clapp, he caused the patents to be issued in their name, they holding the legal title as security for the money they had advanced. In 1855 Ruggles W. Clapp proposed to purchase the store and stock of goods referred to from McLean, for the joint benefit of himself and his brother Henry, and in order to furnish security for this purchase, Henry caused Jason and Edwin to deed the lands to Ruggles, in order that he might execute this mortgage to McLean. Prior to this conveyance the claim of Edwin and Jason had been paid, so that the legal title was placed in Ruggles simply for the purpose of the mortgage, the equitable title remaining in Henry; and as he was living on the place, and in full, exclusive and open possession, notice of his equitable interest in the property was thereby given to McLean, as to every one else. *Landes* v. *Brant*, 10 How. 348; *Lea* v. *Polk County Copper Co.*, 21 How. 493; *Noyes* v. *Hall*, 97 U. S. 34; the latter an Illinois case. Ruggles never had any equitable interest in the property. He took the legal title simply as a conduit, through which the mortgage lien might pass. When, therefore, by the settlement the notes were paid and surrendered, Ruggles held only the naked legal title, with no power to further incumber the land for any purpose. These letters of Ruggles, if written on the dates they bear, were not written until two years after McLean had full knowledge of the character and value of the securities, and when, by his conduct in retaining possession, paying taxes and receiving rents, he had ratified and approved the settlement. Ruggles W. Clapp could not then, even if he were ever so much disposed, by any arrangement with McLean, replace an incumbrance on the real estate. He might bind himself, but he could not bind Henry, nor burden Henry's full, unincumbered, though only equitable, title to the property. In January, 1861, Ruggles W. Clapp quit-claimed the land to Henry, and in March, 1869, Henry deeded to Lot Chadwick, whose heirs are the real defendants here, and in whom the legal title now rests.

Summing up this matter, it appears that this alleged rescission by consent was made five or six years after the settlement and two years after McLean had been fully informed of all the circumstances which justified a rescission; and after he, with full knowledge, had ratified and affirmed it. Under those circumstances, though binding upon Ruggles W. Clapp, the party consenting thereto, it was not binding upon others who did not consent; and especially not on Henry Clapp, the owner of the full equitable title, who neither knew of nor consented to this rescission. After the lien had once been discharged, under such circumstances that it was beyond the recall of the mortgagee, no act or consent of Ruggles W. Clapp, the mortgagor, could renew the incumbrance upon the lands. Henry Clapp's full equitable title was, therefore, not disturbed or incumbered by this alleged voluntary rescission.

Our conclusion, therefore, is that the decree of the Circuit Court was right and must be affirmed. It may also be a question whether the delay and laches in bringing this suit would not bar a recovery; but we do not care to enter into any consideration of this question, as the equity of the matter we have considered is clear.

*Decree affirmed.*

The CHIEF JUSTICE, MR. JUSTICE BRADLEY and MR. JUSTICE GRAY did not hear the argument nor take part in the decision of this case.