ROBERT WYLIE AND JAMES M. WYLIE v. HENRY GAMBLE, ARCHIBALD G. LINDSAY, AND U. GRANT RACE, ADMINISTRATOR OF THE ESTATE OF PATRICK M. GAMBLE, DECEASED.

*Contract—Sale of lands—Fraud—Rescission—Waiver.*

1. A completed contract for the purchase of land cannot be said to have been made by an acceptance in writing of a refusal of the land at a stated price, but without agreeing as to the time and terms of payment, or upon other matters subsequently incorporated in a written agreement.

2. Where a purchaser of land desires to rescind the contract on the ground of the alleged false representations of the vendor as to the quantity of timber thereon, it is his duty, upon discovering the facts, at once to announce his purpose to rescind, and to adhere to it.

Appeal from Alger. (Steere, J.) Argued February 3, 1893. Decided June 1, 1893.

Bill to foreclose a land contract. Defendant Gamble appeals. Decree affirmed. The facts are stated in the opinion.

*William H. Sweet* (*Benton Hanchett,* of counsel), for complainant.

*Tarsney & Weadock* (*W. W. Wicker,* of counsel), for appellant.

LONG, J. This bill was filed to foreclose a contract between the complainants and defendant Henry Gamble for the sale by complainants to Gamble of certain pine lands situate in Alger county. The bill alleges that the contract was entered into September 13, 1886, the contract price being $80,000. The cash payment was $10,000, the balance to be paid in four installments, the last of which was due September 13, 1889. The first two installments were paid, and the last two remained unpaid, amounting at the time of the filing of this bill to $61,646.82, together with $875 as taxes. Lindsay and Race were made parties defendant by reason of an interest in the contract under an assignment from Gamble. The bill asks specific performance of the contract and payment of the amount due, or that defendants be foreclosed, and the lands sold under the order and direction of the court.

Defendants, answering, admit the execution of the contract, and that Gamble has not paid the last two notes; admit the assignment to Lindsay & Gamble of an interest in the contract. It is alleged by the answer that defendant Gamble, at the time of making the contract, had the greatest confidence in the integrity and ability of complainants, and in any statements made by them, or either of them, in connection with pine timber or the lumber business; that, before entering into the contract, complainants represented in writing to defendant Gamble that there was 19,740,000 feet of merchantable pine timber on said lands, and that such timber would overrun sufficiently to make upwards of 20,000,000 on the tract; that complainant Robert Wylie represented that he had personally examined a large part of the land to ascertain the quality and quantity of the timber thereon, and that the statement was made from his personal examination; that representations were made by complainants, both at and after the time of making such sale, that there was standing, grow-

ing, and being upon said land the quantity and quality
of pine timber stated in the written estimate. It is alleged
that the representations of Robert Wylie were false, and
made with intention to cheat and defraud the defendant
as to the quantity and quality of pine on said lands, and
that, by reason of such false and fraudulent representations,
Gamble was lead to believe, and did believe, that the
quantity and quality of timber was as represented; that
the purchase price was agreed to be upon the basis of $4
per 1,000, stumpage, the figures being approximately
20,000,000 feet, merchantable pine; and that, in the summer
of 1890, defendant Gamble caused an examination to be
made of the lands, and then first learned of the quantity
and quality of the pine upon them. Defendants ask
that they be credited on the purchase price for the differ-
ence between the price as stated in the contract, on the
basis of the estimate, and the actual quantity of merchant-
able pine upon the lands, which they claim, by their proof,
did not exceed 12,000,000 feet.[1]

The court below found due to the complainants upon
the contract, together with the interest and taxes, the sum
of $70,287.25, and awarded a decree of foreclosure and
sale of the lands after July 1, 1892. Defendant Gamble
appeals.

It appears from the testimony that complainants and
defendant Henry Gamble are all experienced lumbermen
and estimators of pine timber. The complainants were the
owners of large tracts of pine lands in the Upper Penin-
sula. Defendant Gamble was also the owner, with others,
of large tracts of pine lands situated there, near the lands
in controversy. Correspondence commenced between the
parties in reference to these lands as early as February 17,
1885. On that day, complainants wrote defendant Henry
Gamble that they had the list of lands, fixing the price

---

[1] See *Chase v. Boughton,* 93 Mich. 285.

at $80,000; cash payment, $25,000 down, and balance on
time. On the 9th of March following they gave Gamble
the refusal of the lands for 60 days, reserving the right to
sell at any time to a Mr. Randolph, as talked. Nothing
further appears to have been done between the parties, so
far as any writings passing between them, until the 1st of
February, 1886, when they again gave Gamble the refusal
of the lands for 30 days from March 1, reserving the right
to sell to other parties.

Mr. Gamble testified that, a few days before the contract
of purchase of the land was entered into, Robert Wylie,
one of the complainants, came to his office, and stated
that he had been offered $90,000 for the land, and if he
(Gamble) wanted the deal he must take it at once, and he
then and there agreed to take it at the sum of $80,000;
that at the time the only information he had of the
quantity of the timber was an estimate given him by Mr.
Wylie; that this estimate was in writing, and showed that
the land contained 20,000,000 feet of merchantable pine,
or within a few thousand feet of that amount. The wit-
ness was asked to state what Mr. Wylie said concerning
his knowledge of the quantity of timber upon the land,
and in answer said that Wylie had repeatedly told him
that he had examined the land, all but about 2,000,000,—
that he had looked this land over himself,—and it would
easily cut 5,000,000 more than the estimate. He further
testified that Mr. Wylie claimed at the time that he was
selling on the basis of $4 per 1,000, stumpage; that the
bargain was then closed, and he and Wylie went to the
office of complainants' attorney, and gave him the minutes
to draw the contract, and the contract in this case was
executed two or three days thereafter. Mr. Gamble further
testified that in making the purchase he did not rely upon
anything else than the representations made him by Mr.
Wylie concerning the quantity of the timber, and the

written estimate which had been given him by Wylie. He also testified that up to September 30, 1890, his attention had not been seriously called to the fact of a large deficit in the quantity of the timber on the lands.

George Gamble, the son of Henry Gamble, testified to Mr. Wylie's coming to his father's office, and stating that he had been offered $90,000 for the land, but explaining that he would only get $80,000,—the other $10,000 going to the party making the sale; that Wylie then told his father, if he wanted the land he must take it at once, and that if he did he would take a cash payment of $10,000 down, and give time for the balance; that during this conversation his father asked him (the witness) to get the estimate out of the safe, which he did; that this was a written estimate which Mr. Wylie had before that time given his father; that thereupon his father stated that he knew nothing about the timber, and asked Mr. Wylie how much of it he had examined himself, and how much he had depended upon his helpers and land-lookers, when Mr. Wylie said he had seen all but 2,000,000 of it, which was on the other side of the sheet of estimates, but that the 17,000,000 he had looked over and examined personally, and had seen it all; that there was a large quantity which the estimate did not show, as they had taken the timber only down to a certain size; that the quality was the same as he had shown in the estimate; and that the estimate of amount was correct, so far as it went, but it would overrun on account of the small timber, which had not been estimated. The witness claimed that the purchase was really closed upon that occasion.

Defendants also called seven witnesses, who were either land-lookers or engaged in lumbering, who testified to statements made by the complainants, or one of them, that the land contained upwards of 20,000,000 feet of merchantable pine; that these statements were made dur-

ing the time complainants owned the land, and before Henry Gamble purchased. Several other witnesses testify that Robert Wylie stated that he had examined it personally with a view of estimating the quantity of timber.

The average of 10 estimates made by defendants' witnesses places the quantity at 11,377,100. The average of four estimates made by complainants' witnesses places it at 16,632,000. The court below found that the tract contained less than 15,000,000, and that it was represented to contain 20,000,000 or more, though, from the view taken by the court below upon another point, which will be presently mentioned, a decree was made as prayed in the bill, so that it did not become important for the trial court to ascertain the exact quantity.

The complainants contended in the court below, and contend here:

1. That the contract of sale was completed on August 4, 1886, by an acceptance of their proposition in writing by the defendant Henry Gamble.

2. That Wylie did not make the representations claimed, and that he never turned over the written estimates to defendant Gamble until nearly a year after the contract was entered into, and that they were given to him at his request.

3. That, long prior to the time the contract was made, Gamble had caused estimates to be made, and purchased from such estimates, and not in reliance upon any statements made by complainants, or any estimates made by them, or upon the written estimates.

4. That whatever complainants did say to Henry Gamble was the expression of an opinion, and so understood by Gamble.

5. That Gamble had ample opportunity to make an examination of the lands before the contract was closed, and that no obstacle was placed in his way of so doing; that the price was given him on February 17, 1885, at $80,000, and never changed; and during all the time from that date down to September 13, 1886, he was engaged in a lumber business near the lands, and was personally present in the neighborhood of the lands.

Robert Wylie testified that the complainants bought the lands on estimates made by others, who claimed that the timber thereon would go over 20,000,000; that in his first talk with Henry Gamble he told Gamble he had not estimated the timber, but thought the tract would go from 16,000,000 to 20,000,000, and would not be surprised if it went to 20,000,000, which was his candid judgment at the time; and that that was the only way he represented the amount to Gamble. Mr. Wylie denied the statements made by Henry and George Gamble as to the representations claimed to have been made by him just before the contract was finally signed. In explanation of the estimates being in Mr. Gamble's hands, he testified that in July or August, 1887, he met Mr. Gamble on the street, and was asked by him if he had ever estimated the timber by 40's,—that he had a chance to sell it by putting in his other lands; that he told Gamble he had an estimate made by 40's before he (complainant) purchased, which he would give him, but no timber under 20 inches was included, and that the timber had grown some since; that Mr. Gamble asked him then to have his man copy it off, and have him add what it had grown, which he agreed to do; that when he returned to his office he had his clerk make a copy of the Foster estimates, and told him to add what he (the clerk) thought the timber had grown since, and let Gamble have the copy so made; that this was the last he ever heard of the estimates or the copy. He never saw the copy made by the clerk until he saw it on the trial of the cause. This is the paper which Mr. Gamble and his son George testified they had received just before the contract was signed, on September 13, 1886, and which George Gamble says he took out of the safe at his father's request, and produced to Mr. Wylie, and in reliance upon which, with the oral representations made by Wylie, the defendant made his purchase. Robert Wylie

also denied that any price per 1,000, stumpage, was ever agreed upon. Complainants' clerk corroborates Robert Wylie,—that he was directed to add the figures to the Foster estimates, and give · a copy to defendant Gamble. He says that he made the copy as directed, added his estimates for growth of timber, and mailed it to Mr. Gamble. He does not fix the time definitely when this was done. On his cross-examination it appeared that he knew nothing about timber, had never seen this land, and without any assistance had placed the figures there, swelling the amount of the Foster estimates by several million feet.

Mr. Heath, a witness called by the defendants, testified that he went to examine these lands in the last of August, 1886, and that at that time he was shown by Gamble the paper called the "Foster Estimates," which had been added to by complainants' clerk, swelling the amount of the estimates to nearly 20,000,000.

There is some testimony showing that Henry Gamble had the lands examined before the purchase; but it does not very satisfactorily appear that such estimates were made with intent to rely upon them in making the purchase, or that they were so thoroughly made that he was able to judge of the exact amount of timber, or that he could tell approximately the quantity. It is undoubtedly true that Gamble regarded it as a valuable tract, from what he had seen of it and what others had reported to him, and he made representations regarding its value and the quantity of timber, both before and after his purchase. It is also quite apparent that Gamble had ample opportunity to examine the lands before the purchase, and while negotiations were pending; but it is not so clear that he did examine them, so that he was willing to purchase without further information from the complainants, and apparently he sought such information from them before closing the contract.

After the written refusals above referred to were obtained from the complainants, defendant Gamble wrote them as follows:

"EAST SAGINAW, MICH., Aug. 4, 1886.
"Messrs. WYLIE BROS.

"*Sirs:* I take your lands at the price named, $80,000. Have depended upon them, as I wanted to put with other lands in making trade with parties who are purchasing of us. I have been greatly delayed on account of prolonged absence, but I am ready now to close the trade at any time.

"Very respectfully yours,
"HENRY GAMBLE.
"By HARRIS."

Complainants' counsel claim that this letter of acceptance of the complainants' proposition closed the deal; that by it all the terms of the contract were agreed upon; and that this was written before the written estimates came into the hands of Gamble, and before any oral representations are claimed to have been made, thus showing conclusively that Gamble did not rely upon the Foster estimates, as fixed up by complainants' clerk, or upon the oral representations made by Robert Wylie. It was undoubtedly upon this theory of the case that the court below made its decree, for it was there found that the lands contained less than 15,000,000 of timber.

We find in the brief of defendants' counsel a copy of a portion of the opinion of the court below, which it is claimed by counsel was filed in the cause, in which it is said:

"A careful examination of the voluminous and conflicting testimony as to the amount of pine on the tract leads us to the conclusion that the estimates contained in Exhibit A, which is the written memorandum Gamble claims to have received from complainants, are excessive. In conversation with defendant Gamble and with others, complainants have overestimated the stumpage, as did also defendant Gamble himself, both before and after the time

he states he learned of the deficiency. The testimony, taken as a whole, leads to the inevitable conclusion that the tract contains less than 15,000,000 of merchantable pine. Both complainants and defendant Gamble appear to have repeatedly and invariably represented it at 20,000,000 feet or more. *. * * The correspondence between the parties shows that on February 17, 1885, complainants, by a letter, offered the tract to Gamble for $80,000. On August 4, 1886, he accepted the offer, in the following letter: [Here the trial court sets out the letter of August 4, 1886, written by Gamble to complainants, and which has been set out above. The trial court then concludes:] This gave him, according to the dates of those letters, nearly a year and a half to look over the land, and decide whether or not he would make the purchase. His acceptance of the offer in writing made a binding, legal sale of the lands, and, except as to details of the times of payment, concluded the sale, as afterwards embodied in the written contract. This was all prior to the time Exhibit A, the estimates defendants rely upon, was received by Gamble from the complainants."

The court was in error in supposing that the contract was fully completed and closed by this written acceptance. The price was agreed upon, but the times and terms of payment had not been agreed upon, and the clause in reference to cutting timber not yet settled. The parties themselves did not seem so to construe it, for on August 23, 1886, we find the complainants giving defendant Gamble another refusal to purchase, in the following terms:

"We hereby give Henry Gamble the refusal of our land in the Upper Peninsula from August 29 to September 7, included, providing we don't sell it by August 29."

We think the evidence shows conclusively that the contract was not completed until within two or three days before September 13, 1886, and was finally reduced to writing on that day. If the case rested here we should be strongly impressed with the claim made by the defendant, that he was deceived by the representations made by Mr. Wylie and the Foster estimates, as it would appear from

the testimony and the surrounding circumstances that, while Gamble had ample opportunity to examine the lands before purchasing, yet he must have relied upon the representations of Mr. Wylie and the Foster estimates, rather than solely upon the information he possessed aside from them.

In considering these questions, however, some force must be given to the conduct of defendant Gamble. The contract was made in September, 1886. Some time in August, 1887, Mr. Gamble, not having the money to meet the second and third payments, went to Lindsay & Gamble, of Detroit, and offered to sell them an interest in the contract. He completed an arrangement with them about that time, and borrowed $26,000, assigning the Wylie contract to secure the payment, and assured them that the land contained about 20,000,000 feet of merchantable pine. He at that time showed them the estimates furnished by Wylie. With a view of making a purchase, Lindsay & Gamble employed two land-lookers to examine the lands in the latter part of August, 1887. They made the examination, and reported their estimates at about 10,000,-000 feet. Mr. Lindsay testified that he thereupon told Gamble of this report, and that he would not take an interest in the land, for the reason that the pine was not there, as he had been led to expect by the inspection of the estimates of Mr. Wylie. Gamble also, in the fall of 1888, made an effort to sell the land to Tousey & Turner. He furnished them with an estimate. They made an examination, and found no such quantity of pine, and they declined to take it, stating to Mr. Gamble that no such quantity of pine could be found. In December, 1889, Gamble again offered the land to Ellsmore & Hurst. They examined it, and found only about 11,000,000 feet of pine, and it is evident that Gamble knew of this estimate. Gamble's testimony shows that after all this infor-

mation was imparted to him he spent much time in the immediate neighborhood of the lands, and was several times upon them, showing them to purchasers, and yet he made no complaint to the complainants about the quantity of timber being less than represented at the time of the purchase, and treated the contract as being in full force; and on September 16, 1889, just before the last two notes became due, he obtained an extension to March 15, 1890, to meet them. He also applied to Mr. Wylie in September, 1890, to be permitted to cut 8,000,000 feet of the logs from the land, and offered to guarantee the payment of $40,000 on the contract before the logs should be removed. He testified that he would have carried out this agreement if these foreclosure proceedings had not been commenced. He also made a proposition to the complainants to lumber the lands just prior to the commencement of these proceedings.

Had defendant Gamble set up the claim of fraud and misrepresentations at the outset, as soon as it came to his knowledge that the land contained much less timber than he claims he was led by Mr. Wylie to believe it did, his claim would have some foundation for equitable relief; but his conduct from the fall of 1887 to the time the foreclosure proceedings were commenced contradicts such claim. Instead of making complaint, he still treated the land as his, obtained extension of time of payment, and attempted to make contracts with complainants for permission to lumber it, knowing all the facts which he now sets up to avoid the contract for fraud. This must preclude him from making such a defense. If he desired to rescind on the ground of fraud, it was his duty, upon the discovery of the facts, at once to announce his purpose to do so, and adhere to it. As was said in *Grymes v. Sanders*, 93 U. S. 62:

"If he be silent, and continue to treat the property as

his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted."

This is but the statement of the same rule laid down by this Court in the following cases: *Merrill v. Wilson,* 66 Mich. 232; *Galloway v. Holmes,* 1 Doug. 330; *Jewett v. Petit,* 4 Mich. 508; *Disbrow v. Jones,* Har. Ch. 102; *Street v. Dow,* Id. 427. This rule is also followed in *Schiffer v. Dietz,* 83 N. Y. 300; *Baird v. Mayor,* 96 Id. 567; *McLean v. Clapp,* 141 U. S. 429 (12 Sup. Ct. Rep. 29 ,—and laid down in 1 Story, Eq. Jur. § 203*a*.

The claimed defense, we think, is not made out.

The decree of the court below must be affirmed.

HOOKER, C. J., McGRATH and MONTGOMERY, JJ., concurred. GRANT, J., concurred in the result.