NEW MARTINSVILLE OIL CO. v. BARNETT OIL & GAS CO.

(Circuit Court of Appeals, Fourth Circuit.   July 1, 1919.)

No. 1706.

MINES AND MINERALS ☞74—RIGHT TO RESCIND CONTRACT FOR FRAUD WAIVED BY MODIFICATION OF CONTRACT.

A purchaser of oil property held under lease, which took possession and after operating the wells thereon for seven months, being in default in payments, secured a modification of the contract, by which it obtained better terms, and under which it continued making payments for several months, *held* to have thereby ratified the original contract, and to have lost any right it may have had to rescission on the ground of misrepresentation of the property.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Northern District of West Virginia, at Wheeling; Alston G. Dayton, Judge.

Suit by the Barnett Oil & Gas Company against the New Martinsville Oil Company. Decree for complainant, and defendant appeals. Reversed.

For opinion below, see 254 Fed. 481.

Osman E. Swartz, of Clarksburg, W. Va. (E. Bryan Templeman, of Clarksburg, W. Va., on the brief), for appellant.

J. M. Ritz, of Wheeling, W. Va. (John A. Howard, of Wheeling, W. Va., on the brief), for appellee.

Before KNAPP and WOODS, Circuit Judges, and ROSE, District Judge.

KNAPP, Circuit Judge. In the view we take of this case, it will suffice to outline the somewhat complicated facts out of which the litigation arose. The New Martinsville Oil Company, appellant here, was organized in 1909 under the laws of West Virginia. Prior to January, 1916, it had acquired from one Morgan the lease of a tract of land in Wetzel county, containing about 208 acres, on which it had at that time some ten producing oil wells. The company had been at least moderately successful, was in excellent financial condition, and doubtless believed this property to be of great value. Its outstanding capital stock consisted of 200 shares, of the par value of $20,000.

The appellee company was organized in December, 1915, under the laws of Delaware, and under the name of Federal Oil, Heat & Light Company, with an authorized capital of $1,000,000. In the following month the name was changed to Barnett Oil & Gas Company, and not long afterwards the authorized capital increased to 2,500,000 shares, of the par value of $1 per share. It was incorporated for the purpose of acquiring and developing oil properties, and was promoted by J. W. Barnett, who was its president, his brother, C. W. Barnett, and L. M. Stephens, who was vice president. Stephens associated himself with E. H. Clarke, a New York broker, who undertook to float the stock. At the time of its organization only the nominal sum of $300 was paid in; the company depending upon the sale of stock for money to carry on its operations. As we understand the matter, there was an arrangement between the company and the brokers, by which the latter accounted to the former at the rate of 90 cents for each share of stock sold, retaining for themselves whatever they got from purchasers above that amount.

Some time in the early part of January, 1916, J. W. Barnett, who lived at Clarksburg, W. Va., and was on the lookout for investments for the enterprise he was promoting, happened to meet one W. T. Robinson, whom he had known for several years, learned from him of the New Martinsville property, and asked him to obtain it for his company. This Robinson undertook to do. He had been from the first a stockholder in the New Martinsville company, owning 19½ shares, but had sold his holdings in the previous December for $1,897.50 per share, which represented a value of nearly $350,000 for the property, after deducting cash assets then about to be distributed.

On the 22d of January, in connection with one Stallings, who was also an original stockholder, but had sold out some years before, Robinson secured from the individual owners options on the stock of the New Martinsville company, or the most of it, on the.basis of $350,000 for its property, and upon the agreement to pay $44 per share per week; the options expiring on the 1st of March. Barnett was, of course, informed of this transaction, and early in February paid Robinson and Stallings $5,000, but it does not appear that any part of this sum was turned over to the stockholders. By contract dated the 29th of February, but not signed till the 7th of March, Barnett agreed to buy from Robinson and Stallings the entire capital stock of the New Martinsville company for $350,000, of which $10,000 was to be paid on the 4th of March, and the like sum on the Saturday of each succeeding week until the whole amount was paid. The contract also provided that Barnett should have immediate possession of the property, with the right to manage the same, but was not to "shoot" any of the wells or sell any of the oil produced before full payment of the purchase price. As just stated, the options expired the 1st of March, but on the following day there was an agreement for their renewal, and on March 4th and March 17th two payments, of $10,000 each, were made by Barnett to Robinson and Stallings. Of this sum they retained $2,400, and distributed the balance, $17,600, to the stockholders. The actual transfer of possession seems to have been made, or regarded as made, on the 5th of March, as from that date the Barnett company assumed all expenses of the business, paid the employés, and accounted for the oil produced. The management and operation of the property were committed to one Culp, an experienced oil man, who some time before had been engaged for that purpose.

In the meantime, beginning perhaps early in February, Clarke and Stephens had been selling stock of the Barnett company to the public on the representation that it owned the property in question and statements of daily production which were false and misleading, and apparently some $25,000 had been realized from such sales when the company took possession. After making the first two weekly payments, as above recited, the company was unable to meet the further installments due in March, and the New Martinsville stockholders thereupon threatened a forfeiture. The situation was obviously serious. To say nothing of the false statements regarding production and capacity, it had been represented that the Barnett company owned the Morgan lease, when in fact all it had was Barnett's contract for the purchase of the stock of the New Martinsville company, on which contract only a comparatively small amount had been paid. In this predicament the Barnett company sought the advice and assistance of Mr. John A. Howard, a prominent lawyer of Wheeling. He at once saw the necessity of getting title to the property, as otherwise grave consequences might ensue to those who had·represented that it was already owned. There were various meetings and negotiations, the details of which may be here omitted. The result was an agreement, carried into effect on the 2d of May, by which the New Martinsville company conveyed or assigned the Morgan lease to the Barnett com-

pany for $308,000, of which $255,400 was secured by deed of trust on the property. A cash payment of $35,000, with the $17,600 previously paid to the stockholders, made up the balance of the consideration. The abatement from the $350,000 which Barnett had agreed to pay for the stock, namely, $42,000, represented the amount which Robinson and Stallings were to get as their "commissions." So much of this amount as then remained unpaid was by agreement with them assumed by the Barnett company, in addition to the $308,000. but how it was to be paid or secured the record does not disclose. The $255,400 and interest thereon, secured by the deed of trust, was to be paid in installments of $10,000 a month for the first three months and $20,000 a month thereafter, and there was a further provision that the purchase price would be reduced to $277,400, if the balance to make up that amount were paid in a lump sum within three months.

The Barnett company met the installments due in June, July, and August, but was unable to make the September payment of $20,000. Meetings and negotiations followed during that month, which need not be detailed. The outcome was the payment of enough money to reduce the unpaid balance to $185,400, for which sum and interest thereon a new deed of trust was given, on the same and some other property, dated the 2d of October, and payable in monthly installments of $2,500, beginning the 1st of November. At the same time a second deed of trust was given to Robinson and Stallings for $26,872.74, the unpaid balance on their $42,000, payable in 53 monthly installments.

The installments due the New Martinsville company under this arrangement were paid, at or soon after maturity, for the months of November, December, January, February, and March; but those subsequently maturing remain unpaid. There were some interviews after the default, and a proposal by the Barnett company to pay up all arrears and meet future installments, provided $40,000 was abated from the purchase price and permission given to "shoot" the wells. This proposal was rejected, and shortly afterwards the New Martinsville company began proceedings to sell the property under the deed of trust. Thereupon, on July 14, 1917, the Barnett company brought this suit to rescind the contracts under which the property was acquired, on the ground that its purchase had been induced by misrepresentation, or to recoup the losses alleged to have been sustained thereby, and to enjoin the foreclosure sale. A temporary injunction was granted, and on final hearing the court below entered a decree substantially as prayed for by the plaintiff. The New Martinsville company appeals.

The contentions of the parties are these: Plaintiff asserts that Robinson and Stallings were the authorized agents of the New Martinsville company and its stockholders; that Robinson, in his negotiations with Barnett and Stephens, falsely and fraudulently represented the settled production of the property as greatly in excess of the actual fact; that they and the Barnett company relied upon these representations and believed them to be true; that so believing, and not otherwise, Barnett contracted to buy for the benefit of his company

the New Martinsville stock on which Robinson and Stallings had obtained options; and that the subsequent agreements to purchase the property after discovery of the fraud, first on the 2d of May, and again on the 2d of October, were not an irrevocable election, and do not prevent the maintenance of this suit, because those agreements were made under a species of duress arising from the peculiar hardship of the situation. On the other hand, defendant avers that Robinson and Stallings were not its agents at any time or for any purpose; that they were merely self-constituted middlemen, who got from the individual owners options on their stock at a certain price, with the view of selling the same to Barnett at a much greater price; that Barnett was but the assignee of the option rights of Robinson and Stallings, standing in their shoes and responsible for any misstatements made by them; that Robinson and Stallings did not in fact, nor did either of them, misrepresent the property; that, if they did, their representations were not relied upon and did not induce the purchase; and that in any event the two several ratifications, after full knowledge of the actual production of the property, constitute an irrevocable election by which the plaintiff is bound.

Although the testimony seems to us not altogether convincing, and many circumstances discredit the plaintiff's contention, we may assume, without so deciding, that Barnett was induced to purchase the New Martinsville stock by the false and fraudulent representations of Robinson as to the productive capacity of the property, and that the defendant company and its stockholders are responsible for those representations; in other words, that the original contract was voidable by reason of the gross deceit of Robinson, and that Barnett and his company, upon discovery of the fraud, had the undoubted right to rescind that contract and recover back the moneys paid on account thereof. But it is quite another thing to say, in view of what afterwards happened, that any such right existed at the time this suit was brought, some 16 months later. The governing principle of law is well settled and familiar. In Pomeroy's Equity Jurisprudence, § 897, it is thus stated:

"All these considerations as to the nature of misrepresentations require great punctuality and promptness of action by the deceived party upon his discovery of the fraud. The person who has been misled is required, as soon as he learns the truth, with all reasonable diligence to disaffirm the contract, or abandon the transaction, and give the other party an opportunity of rescinding it, and of restoring both of them to their original position. He is not allowed to go on and derive all possible benefits from the transaction and then claim to be relieved from his own obligations by a rescission or a refusal to perform on his own part. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of and relief from the representations."

In Shappirio v. Goldberg, 192 U. S. 232, 242, 24 Sup. Ct. 259, 261 (48 L. Ed. 419) the Supreme Court says:

"It is well settled by repeated decisions of this court that, where a party desires to rescind upon the ground of misrepresentation or fraud, he must upon the discovery of the fraud announce his purpose and adhere to it. If he continues to treat the property as his own, the right of rescission is gone, and

(261 F.)

the party will be held bound by the contract. Grymes v. Sanders, 93 U. S. 55 [23 L. Ed. 798]; McLean v. Clapp, 141 U. S. 429 [12 Sup. Ct. 29, 35 L. Ed. 804]. In other words, when a party discovers that he has been deceived in a transaction of this character he may resort to an action at law to recover damages, or he may have the transaction set aside in which he has been wronged by the rescission of the contract. If he choose the latter remedy, he must act promptly, 'announce his purpose and adhere to it,' and not by acts of ownership continue to assert right and title over the property as though it belonged to him."

Application of this principle to the facts assumed decides the controversy. As above stated, Barnett was put in possession of the property on the 5th of March, in accordance with the provision in his contract with Robinson and Stallings for the purchase of the stock, and installed Culp, an expert in the operation of oil wells, as manager of the business. From that time Barnett and his company knew or had the means of knowing—for the sources of information were at their command—approximately, if not exactly, the output of the wells from day to day. It was nearly two months later that the Morgan lease itself was assigned, the first deed of trust executed, the unpaid installments reduced from $10,000 a week to $10,000 a month, and the commissions of Robinson and Stallings assumed by the Barnett company. In the meantime there had been default of payment under the original contract, charges of misrepresentation made, and negotiations for a settlement carried on under the direction of Mr. Howard, whose aid was obtained about the 1st of April. It is quite difficult to believe that the parties who claim to have been so grossly defrauded were still ignorant of the true state of affairs on the 2d of May, when the property was transferred, and their willingness to enter into the contract of that date may be otherwise explained. Some of them at least, solely by their own fault, were in an embarrassing, if not dangerous, position, for they had sold stock to the public on the false representation that the Barnett company owned the Morgan lease, and they were therefore under peculiar inducement to have the property acquired at almost any cost. Taking into account the situation then existing, we may concede, for the purpose of deciding the appeal, that the right of rescission was not lost by the execution of the May contract, but survived to the plaintiff for a reasonable time thereafter.

This brings us to what subsequently occurred. For the 5 months following, from May 2d to October 2d, with complete possession of the property under title that is unquestioned, and with every opportunity to know precisely what it was producing, the plaintiff took no steps to rescind the contract then in force, and gave no sign of any intention to disaffirm it, or to claim further abatement of the price. Payments as agreed were made for June, July, and August, and the failure to pay the September installment was put upon the ground, not that the purchase had been induced by fraud and deceit, but distinctly on the ground that plaintiff was without funds to meet its obligations. Then came the settlement, to so call it, of October 2d, when $40,000 more was paid and a new trust deed given, with payments on the amount secured thereby reduced to $2,500 a month. It seems

little short of puerile to say that at that time, after 7 months of possession and operation, the officers and promoters of the plaintiff company did not know all that could be known about this property.  If they did not know, it must be because they purposely remained in ignorance.  Yet with full knowledge of the facts, or chargeable with such knowledge, they deliberately and intelligently chose, not to cancel the contract because it was claimed to be fraudulent, but to make a new promise, somewhat more favorable in terms, to keep what they had bought and pay the balance of the purchase price.  We cannot doubt that this was an irrevocable election by which the plaintiff is bound.  As the Supreme Court said in Fitzpatrick v. Flannagan, 106 U. S. 648, 660, 1 Sup. Ct. 369, 379 (27 L. Ed. 211):

"A subsequent promise, with full knowledge of the facts, is certainly equivalent to an original promise made under similar circumstances; and no one, acting with full knowledge, can justly say that he has been deceived by false representations. Volenti non fit injuria."

Nor does it appear to us that plaintiff, in making the October contract, was influenced by anything that at all resembles duress, as that term has been repeatedly defined.  True, it was then in financial straits, and the sale of its stock would have been greatly hampered, if not brought to an end, by any attempt to withdraw from the undertaking, or by losing the property under a foreclosure sale.  But this was a situation for which the promoters of the enterprise were wholly responsible, and it was for them to decide whether they would suffer the discredit of failure, and whatever consequences might follow, or try to make the best of a bad bargain.  They were under no sort of compulsion, save business interest; and so, with clear comprehension of the facts and of what they were doing, and under the advice of an able and experienced lawyer, they elected to take the latter alternative, and it seems undeniable that they could not thereafter be heard to say that they had been deceived.

But this is not all.  Following the October arrangement, and as then agreed, plaintiff paid the installments falling due in the next 5 months, without protest and without indicating any purpose to demand relief from the contract.  Indeed, it was not until after default for the subsequent 3 months or more, and when defendant had given notice of sale under the deed of trust, that this suit was brought, and the purchase made nearly 16 months before sought to be set aside on the ground that it had been procured by fraud.

We deem it unnecessary to indulge in further comment, for the facts themselves furnish the sufficient argument.  Even if plaintiff's version be accepted, it must nevertheless be held upon principle and authority that the action comes too late.  The alleged fraud upon which it is based was known to plaintiff's officers and advisers, in full measure and extent, in the previous October, 9 months before, when upon mature deliberation it was decided to affirm the contract of purchase.  By the election then made, to say nothing of what afterwards happened, plaintiff waived the charge of deceit, and lost irrevocably the right of rescission or abatement.

The decree appealed from is reversed, and the cause remanded, with instructions to vacate the injunction and dismiss the bill. We do not perceive that defendant at this time needs affirmative relief.

Reversed.