# CASES

## ARGUED AND DETERMINED

### IN THE

## CIRCUIT COURTS OF APPEALS AND DISTRICT COURTS OF THE UNITED STATES, AND COURT OF APPEALS OF THE DISTRICT OF COLUMBIA

---

**WILLIAMS v. PENN MUT. LIFE INS. CO. (two cases).**

Circuit Court of Appeals, Fifth Circuit. June 27, 1928.

Rehearing Denied July 27, 1928.

Nos. 4986, 4987.

**1. Insurance ☞87—Insurer held bound by representations of one employed to effect settlement.**

Insurance company *held* bound by representations of one employed by it to effect a settlement on certain policies.

**2. Fraud ☞50, 58(1)—Fraud is never presumed, but must be proved by person asserting it with reasonable certainty by preponderance of evidence.**

Fraud is never presumed, and person asserting it has burden of proving it with reasonable certainty by preponderance of convincing evidence.

**3. Contracts ☞94(5)—Transaction cannot be set aside for fraudulent representations, unless believed and acted on to detriment of complaining party.**

A transaction, once completed, may not be set aside on the ground of fraudulent representations, unless the party to whom such representations were made believed and acted on them to his detriment.

**4. Insurance ☞665(7)—Evidence held insufficient to establish fraud in procurement of releases and cancellation of insurance policies.**

Evidence *held* insufficient to establish fraud in the procurement of releases and cancellation of insurance policies.

**5. Contracts ☞270(2)—To set aside transaction for fraud, aggrieved party must act promptly, and cannot be relieved where delay has caused change of position, precluding restoration of status quo.**

Generally, where a transaction is sought to be set aside on the ground of fraud, the aggrieved party must take steps to that end promptly, and is rarely granted relief when a delay has caused a change in the position of

27 F.(2d)—1

the adverse party, such that status quo cannot be restored.

**6. Cancellation of instruments ☞34(1)—Laches of parties seeking cancellation of releases of insurance claims held to preclude relief.**

Where parties giving releases and agreements for cancellation of insurance policies knew of alleged fraud within a very short time after such agreements, but made no effort to obtain a cancellation thereof until after lapse of time within which policies were contestable, and then failed for several years to bring suit to trial, resulting in loss of witnesses, *held*, relief was precluded on ground of laches.

Appeal from the District Court of the United States for the Southern District of Florida; Rhydon M. Call, Judge.

Suit by Martha S. Painter and another against the Penn Mutual Life Insurance Company, revived in the name of Simon F. Williams, as administrator of the estates of both plaintiffs. From the judgment for defendant, plaintiff appeals. Affirmed.

See, also, 6 F.(2d) 322.

Isaac A. Stewart and Tom B. Stewart, both of De Land, Fla., and George C. Bedell and Chester Bedell, both of Jacksonville, Fla., for appellant.

James F. Glen, P. O. Knight, A. G. Turner, and C. F. Thompson, all of Tampa, Fla. (Knight, Thompson & Turner, of Tampa, Fla., on the brief), for appellee.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

FOSTER, Circuit Judge. These cases present appeals from adverse judgments in two suits brought to set aside releases and cancellations of insurance policies on the life of Edward O. Painter, issued by appellee. The facts in each case are identical, and the appeals are brought up on one record, which

is voluminous, consisting of over 1,100 printed pages, with many exhibits. Much of the evidence is immaterial to the issues presented on appeal, but some of it may be adverted to for a better understanding of those issues. The facts will be briefly referred to in the course of the opinion.

Edward O. Painter fell overboard from a public ferry and was drowned on May 22, 1913, in the St. Johns river, at Jacksonville, Fla., leaving surviving him his widow, Martha, and a daughter, Okle. The circumstances attending his death were somewhat dramatic, but need not be stated.

Appellee had issued three policies on the life of Edward O. Painter, one for $3,000, which was incontestable, one for $47,000, issued April 18, 1913, payable to his estate, and one for $50,000, issued February 24, 1913, which by a change of beneficiary was made payable to his wife. These policies contained the usual clauses voiding them in the event of suicide, whether sane or insane, and making them incontestable after one year from their dates. At the time of his death, including the policies just mentioned, Painter had life insurance to the amount of $1,022,000, and accident insurance to the amount of $95,000, about 85 per cent. of which had been secured within a few months of his death.

Painter's body was recovered the same day he was drowned, and was immediately taken to an undertaking establishment, where, without the knowledge or consent of his family, or authority from the coroner, an autopsy was performed, and his brain and other vital organs were removed and sent to Baltimore for examination. The testimony regarding this occurrence goes into much gruesome detail, which it would be nauseating to repeat. It is enough to say that it was an outrage against decency, meriting the severest condemnation, but it is not shown that appellee's agents had anything to do with it; on the contrary, the record supports the conclusion that it was perpetrated by unauthorized persons for the dishonest purpose of later extorting money from interested parties for the disclosure or suppression of the evidence that might be obtained. Some of the policies gave the right to the insurer to demand an autopsy as a condition precedent to recovery, and later the one performed was approved by Painter's widow and daughter.

After the vital organs had been taken to Baltimore, a suit was instituted there by the United States Fidelity & Guarantee Company on June 18, 1913, for the purpose of impounding them, that company insisting on the right of an independent examination, under the terms of a policy it had issued. Appellee and several other insurance companies made themselves parties to this suit, as did Painter's widow and daughter, who were executors under his will.

On June 23, 1913, through the efforts of one Thompson, a settlement was effected between appellee and the beneficiaries, whereby the $3,000 policy was paid in full, premiums on the other two policies were returned, and releases were executed.

On August 27, 1914, more than a year after the settlement, and after the period in which the policies could have been contested under their terms had elapsed, suits were brought in a state court by Painter's executors, and by his widow individually, to set aside the settlement on the grounds that it was without consideration and had been induced by fraudulent representations. The allegations as to this need not be set out here in detail, as the false representations relied on appear fully in the summary of appellant's testimony. These suits were promptly removed to the District Court, and motions to strike parts of the bills and to dismiss them entirely were filed. Nothing further was done in the cases for more than eight years, until on March 24, 1923, a hearing was had on these motions. The motion to strike was granted, and the motion to dismiss was overruled. After this an answer was filed on July 18, 1923. While the litigation was pending appellant married Okle Painter. Later both she and her mother died. Appellant was appointed administrator of both estates. On July 1, 1924, he filed petitions in his official capacity to revive these suits, and orders of revival were entered. After this amended answers were filed, and the suits finally went to trial.

In its answers and amended answers appellee denied that any false and fraudulent representations were made on its behalf, which were believed by the complainants, to induce them to make the settlement, and set up that, if such were the case, the falsity of the representations was known to complainants within 10 days after the settlement, and no action was taken by them until after the year in which the policies might have been contested had elapsed. Appellee also charged, on information and belief, that the insured had committed suicide, and further alleged that certain material false statements were made by the insured as to other insur-

ance in his applications, all of which could have been pleaded in defense, if the contestable period had not elapsed.

The District Court found that the beneficiaries in the policies knew in a very few days after the settlement had been made that the statements claimed to have been made to them by Thompson were false, and yet they did nothing to have the settlement vacated until after the policies had become incontestable; that the evidence supported the averments of the answers as to the false statements in the applications for insurance; and that it was impossible to restore the parties to the status quo. For these reasons, decrees were entered on February 25, 1926, dismissing the bills, about 11 years and 6 months after the suits were begun.

[1] There is no doubt that appellee would be bound by any representations made by Thompson. He was specially employed to bring about a settlement on the policies with the Painters, and his action was subsequently ratified by the company. However, the proof of his representations depends entirely upon the testimony of appellant, Williams. Thompson did not testify. He had disappeared, and his whereabouts were unknown. The other parties to whom he had made representations, Mrs. Painter and her daughter, were dead.

Williams' testimony as to the transaction is substantially this: Thompson came to see him, and exhibited a Masonic emblem and Woodmen of the World credentials, and said he was a preacher by profession and bore a message from Masonry, of which Painter had been a prominent member, and pledged him to secrecy. He then said that, when Painter fell overboard he had given a Masonic signal of distress, which was observed by a brother Mason, and that that had impressed an obligation on that Mason and all other Masons to relieve the widow and daughter of embarrassment; that through the efforts of 42 Masons, whose names he declined to divulge, some of whom represented interested insurance companies, an agreement had been made with all but one or two of the insurance companies to settle their policies, in the event that a settlement was made with the Penn Mutual; that the Penn Mutual really controlled the litigation over the vital parts of the deceased at Baltimore, and that, if a settlement were made, that suit would be dismissed at once and the vital organs promptly returned for interment, and that the Penn Mutual would announce that it had made a settlement in full,

based upon which, and through the influence of members of the Masonic order, the other insurance companies would pay in full; that Thompson's statements to him were afterwards repeated to Mrs. and Miss Painter, and because of their high regard for the Masonic order and their anxiety to recover the vital organs, both for sentimental reasons and for fear that something would be put into them to indicate suicide, they agreed to accept the settlement. Williams' testimony is corroborated by a letter written by Thompson, about a month after the settlement had been made, to the effect that the Mutual Life, the New York Life, the Union Central, and the Equitable Life Insurance companies would pay in full, in the event of a settlement with the Penn Mutual; but the letter goes no further, and there is nothing in it about the Masonic influence that would be brought to bear.

Regarding Thompson's activities, Gill and Acosta, respectively supervisor of death claims and state agent of appellee, who employed him, testify in substance that Thompson, who was a soliciting agent for the Penn Mutual, approached them and said he could settle the claims, and convinced them he had evidence in his possession, which he declined to disclose, which would show that Painter had in fact committed suicide. He was authorized by them to effect the settlement of the policies for that reason. Later he was paid a fee of $10,000 for his services.

There is nothing in Williams' testimony to indicate that Thompson stated that he was in possession of evidence that Painter had committed suicide; but it is admitted that a rumor to that effect was current in Jacksonville, and Williams and the Painters knew of it. It is true that appellee secured the releases for no more than it would have had to pay in any event, but, on the other hand, the Painters received as much as they were entitled to, if the insurance companies could sustain the defense of suicide or breach of warranty in the applications for the policies. [2, 3] Fraud is never presumed, and the burden was on appellant to prove it with reasonable certainty by a preponderance of convincing evidence. It is also the rule that a transaction, once completed, may not be set aside on the ground of fraudulent representations, unless the party to whom they were made believed them, and acted upon them to his detriment.

Williams was an attorney of about 3 years' experience, and was then engaged to marry Okle Painter. Miss Painter evident-

ly had some business experience, as she was president of the Painter Fertilizer Company. In the light of Williams' testimony, the transaction of settlement was not very creditable to the agents of the Penn Mutual, who brought it about; but it stretches credulity very greatly to believe that the Painters made the settlement solely because of the representations of Thompson. It would not be a very violent presumption to indulge that they were perfectly willing to enter into a fraudulent agreement for the purpose of inducing other insurance companies to pay in full on policies that might otherwise have been successfully contested.

[4] The litigation over the vital parts was not dismissed promptly, and was carried to the Supreme Court of the United States before the parts were returned, and the other insurance companies did not pay promptly; but, considering the whole case on the evidence in the record, the proof is hardly sufficient to sustain the bills on the allegations of fraud. Aside from this, however, we agree with the District Court in his conclusions, and think the decrees are sustainable for the reasons given by him.

[5, 6] The general rule is that, where a transaction is sought to be set aside on the ground of fraud, the aggrieved party must take steps to that end promptly after discovering the fraud, and relief is rarely granted when a delay has caused a change in the position of the other party, so that the status quo cannot be restored. Neblett v. MacFarland, 92 U. S. 101, 23 L. Ed. 471; Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798; McLean v. Clapp, 141 U. S. 429, 12 S. Ct. 29, 35 L. Ed. 804.

Appellant seeks to excuse the delay in the bringing and prosecution of these suits by saying that he and the Painters had a high regard for the Masonic order and were disarmed by their pledge of secrecy. This is no doubt an expression of very fine sentiment, but it was not legal ground for delay.

We think that, by delaying suit, with knowledge of the fraud perpetrated, until after the policies were incontestable on the ground of suicide, or for breach of warranty in the applications, particularly considering the long delay in prosecuting the suit, with consequent loss of witnesses, especially Thompson, appellant has been guilty of laches, and has lost the right to have the releases set aside. Johnston v. Standard Mining Co., 148 U. S. 360, 13 S. Ct. 585, 37 L. Ed. 480; Willard v. Wood, 164 U. S. 502, 507, 17 S. Ct. 176, 41 L. Ed. 531.

Affirmed.