F. A. BEAN, Appellant, v. S. B. BICKLEY et al., Appellees.

**VENDOR AND PURCHASER:** Sale (?) or Agency (?)    Contract
1   reviewed, and held to constitute a contract of agency, and not
a sale.   It necessarily follows that the appellate court may not
disturb a verdict finding that, notwithstanding the contract, one
party to the contract remained the owner of the land, and was
responsible for the fraud of his agent.

**APPEAL AND ERROR:** Harmless Error—Facts Otherwise Shown.
2   Harmless error results from a refusal to strike objectionable
but inconsequential testimony, slightly tending to prove a fact
abundantly established by other evidence.

**VENDOR AND PURCHASER:** Sale (?) or Agency (?)—Course of
3   Dealing.   On the issue whether defendant had parted with title
and control of land, and was, therefore, not liable for fraud of
an alleged agent, evidence is admissible tending to show that
the defendant was consulted on all questions attending sales.

**APPEAL AND ERROR:** Reserved Rulings.   Error may not be based
4,12 on the admission of evidence under a reserved ruling, not
later called to the attention of the court.

**FRAUD:** Actionable Representations.   False representations as to
5   the amount of tillable land in a given quarter, with resulting
substantial damage, are actionable.

**TRIAL:** Instructions—Correct But Inexplicit.   Instructions which
6   are correct so far as they go, are all-sufficient in the absence of
request for a more explicit one.

**FRAUD:** Scienter—Verdict Conclusive.   A jury finding on con-
7   flicting evidence that representations were, when made, false,
to the knowledge of the maker, and were made with intent to
defraud, is conclusive.

**EVIDENCE:** Documentary Evidence—Proper Foundation.   Evi-
8   dence relative to the accuracy of plats of land showing the
amount of tillable land reviewed, and held sufficient to justify
their admissibility.

**EVIDENCE:** Opinion—Estimate of Acreage.   A farmer who has
9   had experience in estimating the acreage in divers tracts of
land is competent to express an opinion as to such acreage.

**EVIDENCE:** Opinion—Estimate of Land Values.   One who has
10   been extensively engaged in the selling of particular lands, and
has been over them, is competent to testify to their value.

**APPEAL AND ERROR:** Unidentified Exception.   An objection in
11   the trial court as "same objection" will be disregarded on ap-

peal, when the record wholly fails to show what said objection was.

**APPEAL AND ERROR:** Reserved Rulings.
4,12

**APPEAL AND ERROR:** Harmless Error—Fact Otherwise Shown.
13 Exclusion of material testimony of a fact fully shown by other testimony is harmless. So held as to the bias and interest of a witness.

**TRIAL:** Reception of Evidence—Profert. Questions which in no
14 wise suggest the relevancy of the offered testimony must be accompanied by a proper offer or explanation.

**FRAUD:** Reliance—Jury Question. The issues of *reliance* on mate-
15 rial representations, and of the *right* to so rely, are solely for the jury, on fair conflict of evidence. So held where the buyer of land had inspected the land in question.

**FRAUD:** Discovery of Fraud—Affirmance (?) or Rescission (?) One
16 who, after buying a farm for the purpose of farming, and moving thereon, discovers that the contract was induced by a fraud, is not compelled to rescind. He may affirm the contract, and counterclaim for damages, when sued for the contract price.

**FRAUD:** Waiver of Damages—Non-Probative Evidence. In an ac-
17 tion for damages for breach of a fraud-induced contract, the issue of *waiver of damages* is not established by evidence that, after discovering the fraud, (1) defendant made payments, and apologized for not making them sooner, (2) requested a change in the form of the security, (3) made improvements on the property, (4) continuously remained in possession, (5) was guilty of unnatural silence on the subject of the fraud, up to the time he was sued for the purchase price, and (6) counterclaimed for damages, when so sued.

**FRAUD:** Affirmance of Fraud-Induced Contract as Bar to Damages.
18 Affirmance of a fraud-induced contract, (1) by keeping the thing bargained for, or (2) *by obtaining an extension of time or change in terms of payment*, bars rescission, but waives neither the fraud nor the right to recover damages. Phrased differently, *acts which but affirm the contract do not work a waiver of damages.*

**SET-OFF AND COUNTERCLAIM:** Nature and Grounds. A coun-
19 terclaim for damages arising from a fraud-induced contract is, in effect, a plea of payment.

**APPEAL AND ERROR:** Sufficiency of Pleading. The sufficiency of an answer or counterclaim to constitute a defense or cause of action may not be first raised on appeal.

*Appeal from Black Hawk District Court.*—H. B. BOIES, Judge.

NOVEMBER 11, 1919.

SUIT to recover on a promissory note. Execution admitted. Counterclaim for damages alleged to have resulted from fraud practiced in a land sale, for the purchase price of which said note was given. There was a judgment on the counterclaim which canceled the note and mortgage. Plaintiff appeals.—*Affirmed.*

*Einar Hoidale, F. S. Merriau,* and *Sullivan & Sullivan,* for appellant.

*Pickett, Swisher & Farwell,* for appellees.

SALINGER, J.—I. Appellant asks us to hold, as matter of law, that he was not the owner of the lands bought by defendant Bickley. If we may do this, it would become immaterial what fraud was practiced in the sale of land to defendant; for, if plaintiff had no interest in that land, he would, in this case, not be responsible for whatever was done to sell the land. The question whether a disposition of lands by a writing constitutes a sale or creates an agency has had full consideration in the case of *Mahnke v. Marken Acres Co.,* 187 Iowa 762. There, many, if not all, the cases relied on by appellant have full consideration, as have many other cases. This makes it unnecessary to lengthen this opinion with a re-analysis. In *Mahnke's* case, we hold that there was a sale, rather than the creation of an agency. But we do this as the trier of the facts. It is the fact that the contract in the *Mahnke* case and in the

1. VENDOR AND
   PURCHASER:
   sale (?) or
   agency (?)

one at bar are quite unlike, and that, in this case, there is evidence upon the true intent of the contract which is not present in the *Mahnke* case. But it is to be said that, if the evidence in the two cases were substantially alike, it would not follow that the same result must be reached in the respective appeals in them. The essential test is not the name given to the contract, but the real purpose and object of the contract. It follows that, though we, as trier of the facts, reached the conclusion that the contract was one of sale, that would not necessarily authorize us, even on like evidence, to interfere with a verdict finding the contrary. The question in this case is whether a finding by verdict that, notwithstanding a written contract, plaintiff had not parted with sale and control, is so lacking in support as that we may set such verdict aside.

The contract in question is entitled "Agency Contract." But we have pointed out in *Mahnke's* case that nomenclature and designation are not at all controlling. What we deem material in the contract is this: The contract recites that Bean desires to dispose of described lands; that the Canadian Company is in the business of retailing lands, both on its own account and *for others,* and desires to acquire the exclusive right to sell said described lands. It is agreed that it shall have such exclusive sale to January 1, 1913, except as is otherwise provided, and it agrees to sell all the land before then. The "otherwise" provision is that nothing in the contract shall preclude the "owner" from personally trading or selling any of the land to other parties. Throughout, Bean is referred to as "owner," and the company as "seller." The seller is to give all its time and attention to selling, and make all reasonable effort to sell, and is to use all reasonable aids to that end. Failure of the company to observe and carry out the provisions of the contract shall, at the election of the owner, terminate the agreement and any and all rights of the company thereun-

der. If the company fails to sell and dispose of all of said lands before January 1, 1913, the owner may have and retain, or recover from the company, if the amount standing to its credit in money, or money due or to become due, is sufficient, a gross sum equal to $6.00 per acre for each and every acre remaining unsold, which is agreed to be stipulated damages, recoverable by the owner. The company shall, from time to time, make such full, fair, and complete report as to its transactions in dealings pertaining to the properties of the owner as he may prescribe and require. The seller company may sell at prices fixed by it, but may not sell at less than $19.50 an acre, unless the owner authorizes a lower price in writing, and this, though all he is entitled to for himself is $17.75 per acre. All contracts with purchasers are to be signed by the owner, who shall not be required to sign unless he shall receive at least a cash payment of $2.50 an acre, and unless the unpaid portion of the price due under the contract, together with the $2.50 an acre paid to the owner, shall aggregate a sum equal to $17.75 for each and every acre. Subject only to the limitation that his acts shall not violate reason, in all sales on credit or on crop payments the contract must be in the form and on conditions approved by the owner in writing. The details of purchasers entering into contract with the seller are prescribed. Within the limits of reason, the owner has the right to prescribe and determine the forms of all contracts to be used, and to pass upon the desirability of any application for a contract from a financially responsible standpoint, and the right to reject any applications found to be undesirable. He is constituted exclusive judge of the question as to what effort shall be made and what expense shall be incurred in attempts to enforce payment due under contracts. There is a provision which contemplates expense incurred for the owner, and stipulates that he must first approve. If a contract with a purchaser

be canceled, the seller is obliged to resell, as originally bound to sell. The initial payment of $2.50 an acre to the owner includes 50 cents which is to be retained until all the land is sold, as a pledge for the performance of the contract, and to be usable as an indemnity if the lands be "culled" to the damage of the owner. It is agreed that the amounts that would otherwise, and in the event of the sale of all of the lands under this contract, be due and payable to the company as collections upon contracts are made, shall not be considered earned by the company, and shall not be due from the owner to it, except in the event that all the lands are sold within the time limit fixed by this contract. But in the event that more than $10,000 is accumulated to the credit of the seller, after computing interest accrued in favor of the owner, under provisions of this contract, and deducting the amount thereof to date of the computation from said credit, such excess shall be considered earned, and be payable to the company upon demand. The compensation of the seller is to be what it gets in excess of $17.50 per acre. It is agreed and understood that a deferred commissions account shall be carried and kept by the party, to which shall be credited, at the time each contract is closed, the amount of commissions which will become due to the seller, from time to time, as payments upon such contracts are made, and that no deferred commissions shall be considered earned until they have been paid in and transferred to said account. There are provisions as to sales or trades by the company for the owner of lands not covered by the description attached to this contract. And in the event the company chooses to purchase on its own account the lands otherwise remaining unsold on the first day of January, 1913, it shall have all amounts standing to its credit applied upon the purchase price of said lands, and its interest in deferred payments upon contracts covering lands sold to others shall, as the same accrue, be applied

upon the contracts for lands so purchased by the company on its own account.

If it were necessary, we would be prepared to hold that, as matter of law, this contract does not evidence a sale, but creates an agency. Its fair ultimate analysis is that the company is a selling agent of the owner; that full control by the owner is retained as to selling every foot of the land; that he retained the power to discharge any person whom the company employed to sell these lands,—the power to deal or refuse to deal with anyone who proposed to buy through the owner's selling agency. The company was bound to account as the owner directed. The point stressed by appellant is that he created an exclusive selling agency. He contends that *Robinson v. Easton*, 93 Cal. 80 (28 Pac. 795), rules that, if the contract should be construed as one conferring an exclusive authority to sell (and it is, in any event, nothing less than that) at a net price to plaintiff, the law is that no fraud on the part of the agent can be the basis of damages against the principal. We do not so read the case. But assume it holds all that is claimed for it. The answer is that no exclusive agency was here created, because appellant expressly retained the right to sell personally.

The contract distinctly negatives that title has passed; it provides for accountings as to profits; gives the "owner" power to fix terms for compensation, in the form of commissions. It disproves any present intent to pass title by expressly providing on what terms the company may later buy. As said, it would not be straining to hold that, as matter of law, this left the owner responsible for any fraud committed by the company through anyone the company employed in selling any of this land. It suffices to say, however, that our interpretation of this contract is fortified by an abundance of evidence showing that the powers reserved to the owner were actually exercised; that the

very money paid by this defendant seems to have gone to this owner; and that, if the reading of the contract plus this evidence be not held to establish the responsibility of plaintiff, as matter of law, it is certainly sufficient to sustain the verdict of the jury, which holds him responsible for what Guerin is said to have done in making the sale to defendant, and upon which the counterclaim of defendant is bottomed. We see little for appellee in *Mankin v. Mankin*, 91 Iowa 406. It but holds that the grantee is chargeable with fraud practiced by his agent in obtaining the deed, although the grantee has no notice of the fraud. So of *Hopkins v. Hawkeye Ins. Co.*, 57 Iowa 203, which but announces the general rule that the fraudulent acts of an agent committed in the direct line of his employment will render the principal liable. That is all, too, that appellee claims for *Wickham v. Evans*, 133 Iowa 552, and not more is the effect of *Mitchell v. Donahey*, 62 Iowa 376. The utmost it holds for appellee is that, if plaintiff knew of a conspiracy by which his agents injured another, or afterwards knowingly ratified that act, he could not recover on a note obtained by the wrong of these agents. Without aid from these, we hold that, if there be liability for what Guerin did, that then this plaintiff must respond.

### 1-a

This assumes that the evidence on the point is unchallenged. But some of the testimony which aids in reaching this conclusion was admitted over objections made.

On cross-examination, the plaintiff interrogated Guerin as to whether Guerin had ever heard or learned that one Larson was operating a certain ranch, and Larson claiming he had it under a contract of purchase from Bean. The witness answered:

2. APPEAL AND
ERROR: harm-
less error:
facts other-
wise shown.

"Why, it was Bean's ranch. ' Larson had no money to buy a ranch with. I know that."

A motion to strike this out, for being nonresponsive, was overruled. It has some slight tendency to prove that Bean was in the habit of owning property which ostensibly was held or controlled by someone other than Bean. The same witness was then asked: "You knew that Mr. Bean held that stock as security for moneys that he had advanced?" He answered:

"Well, Bean furnished all the money that we had, and we paid him all the money we got on sales. It was his company. Larson was a bankrupt, and he hadn't been discharged in bankruptcy, and he had the other—he had the stock in his name. Bean was avoiding double liability."

This, once more, had about the effect that we have given to the first statement of this witness. As to this, however, the motion to strike it, which was overruled, assigned no reason, and merely asked "that all this" be struck out. On recross-examination, plaintiff asked this witness:

"Didn't you know that, during the latter part of that year, because of the fact that the company was owing money to Mr. Bean, they transferred all of their furniture, when they quit doing business, to Mr. Bean, and got credit on their account for the value of the cost price of that furniture?"

He answered:

"Why, that furniture was taken to Mr. Hoidale's office, and all the records. And Mr. Harper, Mr. Bean's auditor, continued on the books, and whenever I saw the books, after they were taken to Mr. Hoidale's office, it was through orders of court—my attorney."

A motion to strike this answer out for being nonresponsive was overruled. The witness was asked, on recross:

"Then the only sale that was made—you had—was a paper sale that you had made to one of the agents, giving him a right, within a certain time, to pick out a certain quarter of land?"

He answered: "You drew up the document." A motion assigning no ground was made to strike out this answer, and the motion was overruled. Concede that some of these motions should have been sustained, does it not appear affirmatively that their overruling was harmless? At most, the retained testimony does not more than slightly tend to show that plaintiff remained the owner of the lands, and controlled their sale. But we have already pointed out that the written contract alone, to say nothing of other clear evidence, most clearly establishes all that. So it must have been harmless to receive this very weak testimony in support of the point that was conclusively proven without its aid.

Guerin was asked:

"How did you fix that, in carrying on your work in the sale of this land, when it came to a question of—that would arise with reference to a sale? What person would you take it up with,—consult with before making a contract,—if any question arose?"

3. VENDOR AND
PURCHASER:
sale (?) or
agency (?):
course of
dealing.

Plaintiff made objection that this was incompetent, irrelevant, and immaterial. This being overruled, the witness answered:

"Why, with Mr. Bean. When he wasn't there, it was always understood that Mr. Hoidale did all of his clerical and legal work. Mr. Bean hardly ever writes a letter, excepting to sign his name to documents occasionally."

This was neither incompetent, irrelevant, or immaterial. It bore legitimately upon the interest retained by plaintiff in what it was claimed he had completely divested himself of.

Defendant testified, without objection, that Guerin was the one he talked to when he selected his land. He was then asked: "With whom representing Mr. Bean, or the

owner of the land, did you talk?" Plain-
tiff objected that this assumed a state of
facts not proven, and that it was leading.
The objection being overruled, the witness
said that it was Guerin.  Then he was asked: "What, if
any, conversation did you have with Guerin at the time you
selected this quarter section?"  To this, plaintiff made ob-
jections that same was incompetent, irrelevant, and imma-
terial, "upon the ground that no foundation has been laid."
This presents once more the thought that there is no evi-
dence making plaintiff liable for Guerin's acts—a conten-
tion against which we have already held.  Be that as it
may, in ruling, the court said merely: "Overruled for the
present,—I don't know what conversation is called for."
This amounts to the reserving of a ruling; wherefore the
assignment is, in any event, unavailable to appellant, be-
cause the matter was not thereafter called to the attention
of the court.

4. APPEAL AND ERROR: reserved rulings.

II.  The next position is that, even if plaintiff is re-
sponsible for what was done in selling, no actionable repre-
sentations are shown to have been made.  If the jury be-
lieved the testimony for the defendant, it
was represented to him that land he was
buying at $28.75 an acre was all tillable ex-
cept some 7 acres; that, in truth, part of
the land was cut off from its main body by a gully and its
banks; that it was impossible to cross the gully with ma-
chinery needed for farming; that there was no access to
the cut-off land without traveling some distance from the
land and across the property of others; and that, in truth,
the creek and gully and said high banks reduce all the land
usable for farming purposes on 160 acres to approximately
100 acres, with 60 acres "absolutely worthless for farming
purposes—with resulting damages in $2,600."  These rep-
resentations were actionable.  There was testimony on

5. FRAUD: actionable representations.

which the jury might have found that no more than mere opinions were expressed by the seller. But it could find, too, as it did, that that which was said was more than such opinion, and was a false representation as to a material fact.

It is urged the court erred "in failing to instruct" that misrepresentations must be of a material fact, and as to what is and is not such fact. This is complaint of a paucity in charging. That is rarely available, un-

6. TRIAL: Instructions: correct but inexplicit.

less an offered instruction speaking more fully was disregarded. None was offered. And we think that materiality was correctly charged upon, at least so far as the charge went.

In the same case is the complaint that there was failure to give full and complete instructions on the issue of fraud and misrepresentation. These, too, are as full as need be, in the absence of a request for greater fullness. Nothing in *Prichard v. Hopkins*, 52 Iowa 120, condemns the instructions given.

### 2-a

There is an assignment that the court erred in neglecting to properly state the issues to the jury, and in stating the issues. We hold the point is not well taken. See *Powers v. Iowa Glue Co.*, 183 Iowa 1082.

### 2-b

It is contended the court erred in refusing to give instructions offered, to the effect that fraud is not presumed, but must be clearly proved by satisfactory evidence. In so far as these offers rightly go, their essentials are found in the charge that was given. There is no equivalent of offered Instruction 22, but there should not be. The offer is a highly declamatory thesis on the general subject of the burden of proof where fraud is alleged. So much of it as is proper on that subject is fairly summed up by the statement that fraud should not be presumed, and that he who

asserts it must establish it by a preponderance. That much, the charge given fairly said.

### 2-c

It is complained that the court did not instruct the jury, in effect, that *scienter* was not proven.

While there is some confusion on the point, we will assume that this action cannot be maintained unless the defendant established by a preponderance that the false representations charged were, when made, known to the maker to be false, and were made with fraudulent intent. We may concede that *Shuttlefield v. Neil,* 163 Iowa 470, at 486, and other of our cases, announce this general rule. But no case denies that, ordinarily, it is for the jury to say whether the standard fixed by the rule has been met by the proof. The fact that such a rule exists does not help us to determine whether the verdict transgressed the rule. It is one thing to say what a rule of law is; quite another to determine that, as matter of law, the jury had no right to find that the rule was met. The jury is the tribunal which must primarily determine whether the evidence meets the standard. *Turner v. Hartford F. Ins. Co.,* 185 Iowa 1363; *Stilwell v. Stilwell,* 186 Iowa 177. As has already been said, under the evidence the jury might have found that Guerin expressed nothing but a mere opinion, and was understood to do no more than that. But, on the other hand, we cannot, under the evidence, say that the jury had no right to find, as it did, that the representations were fraudulently made.

7. FRAUD: scienter: verdict conclusive.

III. There is complaint of the taking of testimony on damages. One Klingaman made measurements, and upon this it is urged that it was possible to show with exactness

just how much of the land was untillable;

that, therefore, certain plats admitted should not have been received because they were inadequate substitutes for exact measurements; and that the condition of the land should not have been allowed to go to the jury in the form of opinions as to the value of the land; and that, at all events, these witnesses were not qualified to testify as to the value.

One Carl testified to the making the plat Exhibit 1. Objections that it was incompetent, irrelevant, and immaterial, that no foundation had been laid for its reception, that no one is competent to testify with reference to the physical condition of the land indicated upon the plat, or has given any testimony which is sufficiently positive and direct to prove any evidence pertaining to the issues in this case, were overruled. This is the situation as to the plat Exhibit 5, a small plat drawn by Klingaman. It has already been stated that Klingaman did make measurements, and Carl testifies that he (Carl) drew the plat Exhibit 1 in the presence of Klingaman, prepared it on information and estimates given by Klingaman and others, and that the plat Exhibit 5 is a rough sketch Klingaman had with him. One Butler testified that he and one Miller prepared the plat Exhibit 5; that plat Exhibit 1 correctly represents the lay of the gully and the amount of tillable and untillable land, as witness saw it when he went over the land and made measurements, and that this is so of the plat of Exhibit 5. Klingaman said, without objection, he thought that the brownish tint on the plat Exhibit 1 accurately represents the amount of land that can be farmed. Against this, appellant says that this plat was not even prepared from memorandum made on the ground when the estimates were made. It seems to us that, on this testimony, the court was not warranted in holding, as matter of law, that

the plats were no evidence; and their value was fairly for the jury.

### 3-a

Appellant contends that the condition of the land was susceptible of exact proof, and should have been so proved, but that the testimony taken is nothing but guess piled on top of guess, and estimate on top of estimate. The testimony thus characterized is this: Klingaman testified he had had considerable experience in farming and looking at pieces of ground and basing an estimate as to how many acres these contained, and he thought he was able to express an estimate as to the number of acres in the parcel of ground in controversy. He was asked:

9. EVIDENCE: opinion: estimate of acreage.

"Based upon your general knowledge and the measurements you made and the observations of the tract of ground, state what, in your judgment, is the number of acres in that land."

He answered: "I would say from 20 to 22 acres." He was asked:

"How many acres do you estimate were in this quarter section that it is possible to use for farming purposes: that is, for cultivation and tilling the soil?"

He made the above answer, 22 acres. We think it would not have been proper to exclude this, and that its value was for the jury.

Guerin testifies he had been "up there" a number of times. He said, without objection, that he had had considerable experience in Canadian land and with undeveloped prairie country; that he had been in the land business before he went with Mr. Bean; that his first employment with this company was going up to their land department along the Canadian Northern Railway; that he was with the company three years; that, during this time,

10. EVIDENCE: opinion: estimate of land values.

he was actively identified with the sale of Canadian lands, "and worked in this," and that, prior to the time in question, he had been up there a number of times. It was at this point he was asked:

"And had investigated the matter? What, in your judgment, was the fair market value of this land on or about the first day of July, 1912, in the condition it was in with reference to the gully which crosses it,—what was its fair market value, in your judgment?"

Over objection, he answered, "Why, it had no value as a single quarter." We concur in the overruling of the objection.

Joder said, without objection, that he thought he had probably heard of 8 or 10 pieces of lands, quarters or 80's or half sections, that had been sold, and the prices paid for them; that he heard this while making investigation as to land values. For some reason, the question as to hearing this, etc., was then renewed, and at this point came the first objection, which was, "same objection." It was overruled. We are unable to see what "same objection" is. This examination occurred on redirect; there was no objection in the entire previous course of the redirect examination preceding this point. We are unable to see what objection was urged, and so dispose of this assignment.

11. APPEAL AND ERROR: unidentified exception.

Joder testified that later, and in the fall of 1913, he made investigation, and at that time ascertained the values of lands, and with reference to whether the values were the same as they had been in 1912. There was no objection to this. He was then asked, "What, in your judgment, was the fair market value of this land on or about the first of July, 1912?" Objection was made that this was incompetent, irrelevant, and immaterial, and that no foundation had been laid, and that the witness had not shown

12. APPEAL AND ERROR: reserved rulings.

himself qualified.   We are inclined to think that the ob-
jection is not well taken.   But that need not be decided.
The ruling was reserved, and the matter was not later call-
ed to the attention of the court; and we dispose of this
point on this situation.

IV.   It is urged there was error in excluding testi-
mony tending to show the bias of the witness Guerin.   He
was asked whether he had succeeded in a lawsuit against
the Canadian Company or Mr. Bean, and as
to what had become of that suit, and wheth-
er it was not true that, during the year
1912, and particularly during the latter
part of it, he got into something of a quar-
rel with the officers of the company.   He was asked, "You
have been advised, have you not, that there are two judg-
ments against you now in two suits that you have lost?"
And, "So that you say now that you don't know how those
suits came out?"   Objection to all this was sustained.
Some of these matters were clearly immaterial.   We are
unable to see how the Canadian Company was interested
in this pending suit, and why, therefore, it was error to
exclude testimony which could, at most, show no more than
a bias against that company.   As for the rest, if the rul-
ings were erroneous, they clearly were harmless.   For, de-
spite the sustaining of the objections, Guerin did say that
he was suing Bean and the company, and that they were
the same thing.   He made further answer that he had law-
suits against the company and Bean, and that as to wheth-
er they had been brought to a close, he had not had time
to look into.   And over the objection of the plaintiff, he
said that he had been notified that the case was coming
on for trial, and that he didn't appear because he couldn't
get away, on account of the serious illness of his wife.   As

13. APPEAL AND
ERROR: harm-
less error:
fact other-
wise shown.

to the question, "Do you know whether I [the interrogator] was acting as attorney in any matter at any time for the Canadian Wheat Lands Company?"—to which objection was sustained, we have to say that we are unable to see what useful purpose an answer to this question could serve, and that it was a case where a profert was necessary, if complaint is to be entertained in this court.

14. TRIAL: reception of evidence: profert.

V. In various ways, including complaint of the refusal of instructions, it is urged the court should have directed a verdict for the plaintiff on the ground that, before defendant bought, he made a thorough inspection of the land, and knew then what the condition of the land was, and that, at worst, there is not more than a mutual mistake as to the size of the gully on the land. Of course, there must be reliance, and on a material representation. 2 Mechem on Sales, Section 879; *Hall v. Johnson,* 41 Mich. 286 (2 N. W. 55). There is an abundance of authority for the proposition that representations may be of such character that no person of ordinary intelligence could be misled thereby, and that such could have had no influence in inducing action. *Hall v. Johnson,* 41 Mich. 286 (2 N. W. 55, 57). They may be so vague, so improbable, and so clearly a mere exaggeration or expression of opinion as that, as matter of law, there is no right to rely. Kerr on Fraud (1872) 82; *Bell v. Byerson,* 11 Iowa 233, at 237. The buyer cannot recover if means of knowledge were as open to him as to the vendor—if the buyer fails to avail himself of means readily accessible, the use of which would have saved him. *Lawson v. Vernon,* 38 Wash. 422 (80 Pac. 559, at 563). There are cases which hold nonreliance is shown, as matter of law. On the other hand, we held, in *Shuttlefield v. Neil,* 163 Iowa 470, and in *Peterson v. McManus,* 187 Iowa 522, that there, reliance and right to rely

15. FRAUD: reliance: jury question.

were for the jury. Here, once again, the rules laid down
by the law are plain. But, once more, we have the ques-
tion whether we may say the jury had no right to find that
defendant could not readily have made himself as well in-
formed as was the seller, or say the jury had no right to
find that defendant did not act on his own information, but
in reliance on representations made by Guerin. We might,
were we sitting as jurors, have agreed with the contentions
of the plaintiff. But may we, as an appellate court, over-
ride the conclusion reached by the jury? True, there was
testimony on which the jury might have found that de-
fendant made an adequate inspection, and knew the condi-
tion of the land before he bought it. But was there not
also testimony which warranted the jury in finding that
defendant relied, and had the right to rely, on the repre-
sentations made? The land lies in a new and undeveloped
country. Most, practically all, the land shown defendant
by Guerin was prairie land, without improvements or
fences. Highways were not so established and marked as
that defendant could locate sections. There was testimony
that, when the quarter was pointed out to defendant, he
was in a position where he could see no gully; that he did
not, in fact, see one; that no one told him there was one;
and that he never knew, from any source, that such a gully
existed, until a man whom he had sent to break, returned
and advised him of its existence. The man who is charged
with having made the representations declared or testified
positively that he did not drive along the sides of the
gully in such manner as to call the attention of the buyers
to the size of the gully or the height of its banks; that at
no time did he direct the attention of anyone to the fact
that there was a wide gully, 50 rods wide at some points;
that there was no way in which anyone unfamiliar with the
details of the topography could, in view of the manner in
which the vendor drove over the ground, know that this

large gully was on the quarter which defendant bought. He says, in effect, that he had a whole party, and a chance to sell a large block of land; that, in such cases, he does not, as a rule, do much, aside from showing the land and waiting until they reach town and cleaned up and felt better, and then lining up the buyer and figuring out what pieces they wanted. He says that, in this case, he figured, if he could make a deal with the whole party, it would mean a nice two section solid, and that he was:

"Using my best judgment in order to make a success of the trip, and make as many sales as I could. And I had it figured out, and am satisfied that, if I had said, 'Here, there is something wrong with one of these pieces,' that I wouldn't have been able to close one of them * * * So I had it figured out, 'Here, I hadn't better create a disturbance here and prevent them signing up.' I knew Mr. Bickley would find it out, and I figured that, when the time came, why, it was easier to settle with Mr. Bickley in a friendly way on a quarter section of land than to spoil $47,000 worth of business; * * * that we could offer to give him a quarter, and there is always a way of settling things like that in a land deal."

Then came this:

"Q. And that was one of the things you had in mind as the reason you didn't disclose to Mr. Bickley the presence of the gully? A. Why, we would have made it right with him. * * * We would offer him another piece of land, or would have given him his money back. I knew he would have been satisfied with one of the two deals."

The jury could find on this that Guerin either failed to show defendant a quarter section which had this gully, or fraudulently showed him some other quarter, or else, in showing the land, he exhibited the same in such way as to conceal from defendants the true character of the quarter section, and that defendant bought in the belief that he was

buying a quarter section which had been shown to him, and been represented as being substantially all tillable land; could find that the vendor not only failed to call attention to the gully, but did the driving in such manner as that discovering the true condition of the land being bought became impracticable, if not impossible. The right to rely is almost absolute, so far as believing that land pointed out by the vendor is the land that it is proposed to buy. See *Selby v. Matson,* 137 Iowa 97; *McGibbons v. Wilder,* 78 Iowa 531; *Shuttlefield v. Neil,* 163 Iowa 470; *Lawson v. Vernon,* 38 Wash. 422 (80 Pac. 559). If the buyer is ignorant of the location, he has the right to rely upon the positive statements of the vendor in this respect, and to hold him liable although there was no intentional misrepresentation, and the purchaser had means of information as to character and location, before completing the transaction. *Gunther v. Ullrich,* 82 Wis. 222 (52 N. W. 88). In our opinion, the very elaborate note on *Mabardy v. McHugh,* 202 Mass. 148 (88 N. E. 894, 23 L. R. A. [N. S.] 487, 490), demonstrates conclusively that, though such inspection was made as this evidence tends to show, we cannot interfere with the right of the jury to find, as it must have found, that, notwithstanding this inspection, the buyer did rely upon the representations made, and may not say that, as matter of law, there was no right to such reliance.

VI. When one buys with knowledge that the property has certain defects, he cannot recover for a representation that it was free from that defect. Any loss sustained is, in a sense, self-inflicted, and therefore is not traceable to the representation. This rule is applied where a false representation obtains a contract, the fraud is discovered while such contract is wholly executory, and the defrauded party then elects to carry out the contract; and appellant urges that rule in his behalf.

16. FRAUD: discovery of fraud: affirmance (?) or rescission (?)

The many cases which affirm this rule rest on the self-evident proposition that, where one discovers the fraud when he is still wholly at liberty to save himself from its effects, what he thereafter does to his own injury is self-inflicted, and that one may not recover damages which result from his own acts, instead of the act of the defendant. See *Kingman v. Stoddard*, 85 Fed. 740; *People v. Stephens*, 71 N. Y. 527; *Simon v. Goodyear Met. R. Shoe Co.*, 105 Fed. 573; *Richardson v. Lowe*, 149 Fed. 625. And this rule holds, even if there has been partial execution. If the defrauded party is able to stop further performance in safety, at least what he does after discovery is self-inflicted. In that class is *Ponder v. Altura Farms Co.*, 57 Colo. 519 (143 Pac. 570); *Nounnan v. Sutter C. L. Co.*, 81 Cal. 1 (22 Pac. 515); and *Vernol v. Vernol*, 63 N. Y. 45. One may not, with knowledge of all the facts, persist in what he may safely refrain from doing without loss, and speculate with a view to enhancing the loss, if the speculation prove disastrous, and then trace the injury to the claimant. Such injury is not traceable to him. *Ponder v. Altura Farms Co.*, 57 Colo. 519 (143 Pac. 570, at 572); *Gilmer v. Ware*, 19 Ala. 252, at 259; *Thompson v. Libby*, 36 Minn. 287 (31 N. W. 52); *St. John v. Hendrickson*, 81 Ind. 350; *Kingman & Co. v. Stoddard*, 85 Fed. 740; Kerr on Fraud (1st Ed.) 299. And it was held in *Haven v. Neal*, 43 Minn. 315 (45 N. W. 612), and *Sell v. Mississippi R. Log. Co.*, 88 Wis. 581 (60 N. W. 1065), that, in special circumstances, the continuance of work and expenditure after the discovery of a fraud will make intent to waive damages a jury question. But, of course, this is not the rule in executed contracts, *Pryor v. Foster*, 130 N. Y. 171 (29 N. E. 123); *Thompson v. Libby*, 36 Minn. 287 (31 N. W. 52); *Whitney v. Allaire*, 1 N. Y. 305; *Mallory v. Leach*, 35 Vt. 156; and *Parker v. Marquis*, 64 Mo. 38. Naturally, this suggests the inquiry, What is such "executory contract" as this rule deals with?

By such contract is not necessarily meant any contract in which, in any circumstance, something yet remains to be done. While some of the cases attempt a distinction between a defense asserting the fraud, and off-setting or counterclaiming because of it (see *Hunt v. Hardwick,* 68 Ga. 100), such distinction is not tenable. In either case, the gravamen is the fraud. If it may be asserted as a pure defense, it may be done by set-off or counterclaim as well; and it is well settled that it may be asserted by counterclaim. 9 Cyc. 432; *Coe v. Lindley,* 32 Iowa 437; *Ranney v. Warren,* 13 Hun (N. Y.) 11. The right to set-off or to make counterclaim carries with it, of necessity, that the naked fact that something remains to be done by the vendee does not bar redress for the fraud. For the right to counterclaim is often asserted against payments still to be made. See *Ranney v. Warren,* 13 Hun (N. Y.) 11. The true interpretation of the rule is that, if the contract remains executory, in whole or in part, when the fraud is discovered, and no injury will be suffered by rescinding instead of affirming, then any injury caused by proceeding is self-inflicted. There is not, and there should not be, a general rule, even in an executory contract, that mere discovery and proceeding bars all rights to redress. That must depend on the situation of the wronged party. He should not be compelled to refrain from affirming and proceeding further, if rescinding will lose him a profit he would have enjoyed, had he been fairly dealt with—much less, if rescinding will cause him actual injury. It will be found, upon careful examination, that the cases which, on surface reading, declare that acts of affirmance waive damages, are invariably cases (and some of them note the fact) wherein the defrauded party could save himself from further loss by rescinding, and would suffer no injury therefrom. See *Sell v. Mississippi R. Log. Co.,* 88 Wis. 581 (60 N. W. 1065). The case of *Schmidt v. Mesmer,* 116 Cal. 267

(48 Pac. 54), is one which holds the right to damages was lost. But it was a case of a tenant who was at perfect liberty to retire from the lease when he discovered the fraud, but, instead of doing so, asked a reduction of rent, and obtained an extension of time wherein to pay rent, without an intimation of the alleged fraud. The distinction is recognized in the very cases which hold that the fraud has been waived. In *Pryor v. Foster,* 130 N. Y. 171 (29 N. E. 123), paying rent where it was inconvenient to find another house, and where else an ejectment in midwinter would ensue, is held to constitute no waiver. In *Ponder v. Altura Farms Co.,* 57 Colo. 519, 525 (143 Pac. 570, at 572), it was said:

"Cases may probably arise where the defrauded party may, by reason of the wrong, be unable to recede from his situation without prejudice. A proper rule will doubtless be found to cover such cases."

How the party is situated as to retreating is most vital. *McGar v. Williams,* 26 Ala. 469. It holds it was error to charge that partial payments made by plaintiff after discovery that a roof built for him was defective, was an absolute bar to recovery. Such is the effect of *Rice v. Friend Bros. Co.,* 179 Iowa 355.

But be the rule on executory contracts of some kinds and in some circumstances what it may, it does not apply to the case at bar. In it, one intending to farm bought land to farm. No matter what said rule is in some cases, defendant has not lost a right to claim damages merely because he went into possession, and discovered he had been defrauded, and did not rescind. To begin with, to hold him to that would be to give the one who did the wrong the election, instead of giving it to the victim. It would enable the one who cheated to command that rescission should be the sole remedy of the defrauded party. Where the contract is purely executory, and no other circum-

stances intervene, it may well be said that discovering the
fraud at that time cannot injure the vendee, unless, with
his eyes open, he proceeds to injure himself.  But, in the
case at bar, the fraud was as complete on the day the land
was bought as it ever would be.  No act of approval could
enlarge the injury.  That injury was the difference between
what the property was actually worth and what it would
have been worth, had it been as represented.  As said, that
damage was complete and final when the sale was com-
pleted, and whatever the rule on purely executory con-
tracts may be in the aspect of self-invited injury, that rule
cannot have any application here.  As well say that, if the
fraud of a building contractor filled the house erected with
pitfalls and bad workmanship, that the owner of the house
can have no redress unless, as a condition precedent to re-
lief, he abandons his own house.  And *People v. Stephens,*
71 N. Y. 527, declares that *Whitney v. Allaire,* 1 N. Y. 305,
holds nothing except that, where a lessor falsely and fraud-
ulently represents that the premises described in his con-
tract embrace lands which they do not in fact embrace, then
the lessee, by taking possession of the premises that are
actually embraced in the lease, does not preclude himself
from claiming from the landlord compensation as to the
lands which are deficient, to the extent of the rent paid for
land leased to make up the deficiency.

We hold this case is not within the rule governing
self-inflicted injuries.

VII.  It is presented that the court erred in with-
drawing the issue of waiver and estoppel from the consid-
eration of the jury; that the conduct of defendant made it
a question for the jury whether he had not
waived all claim for damages, and estopped
himself to claim any.

17. FRAUD:
waiver of
damages:
non-probative
evidence.

Assume that, after discovery of the al-
leged fraud, defendant apologized for fail-

ing to make payments, and promised to make them, and that he did make payments. Assume that, after discovery, he expressed a desire to take up all unpaid installments, to surrender the contract, and substitute a mortgage, if the rate of interest were kept the same. Assume that, after learning definitely of the size of the gully, defendant built a house and barn on the property, made further improvements, and proceeded to farm the land for the coming year, and has remained in possession, and has since continued to farm the land. Assume he remained silent when it would have been natural for him to complain of the misrepresentation, or, at least, to assert it. Assume that, when he did make complaints, misrepresentation was not included in them, and that when, a year after the alleged fraud, he met with the one whom he now accuses of it, he made no accusation, and all then said between them was in harmony with the possibility that there had been a mutual underestimation of the size of the gully. Assume that no complaint was made until the filing of the counterclaim, three years after the event. Disregard, if you will, testimony to the effect that the defendant made protest quite early. Silence is no bar. It was said in *Schmidt v. Mesmer,* 116 Cal. 267 (48 Pac. 54), that if, instead of rescinding, the party elects to go on with the contract, he may sue in deceit for damages, "without giving any warning to the other party that he intends, at some future time, to charge him with fraud." It is the weight of authority that such matters as these are evidence that no fraud was committed, though no evidence of more than that. *Reger v. Henry,* 48 Okla. 759 (150 Pac. 722); *Huckabee v. Albritton,* 10 Ala. 657; *McGar v. Williams,* 26 Ala. 469. The case of *Moffitt v. Cressler,* 8 Iowa 121, decides no more than that giving a note for the price after discovery of the fraud is merely evidence that no fraud was committed. The case of *Aultman v. Wheeler,* 49 Iowa 647, a breach of warranty

case, is to the same effect. In it, a breach of warranty was declared, and there was a claim that there was waiver, because the purchaser gave notes for the purchase price and renewed those notes.

But does it follow from all this that these make a jury question on whether there had been a waiver of damages, or worked an estoppel to claim them? Was the holding that, as matter of law, no waiver or estoppel had been established, an erroneous ruling? We hold that, while the matters which we have assumed do furnish evidence which made it a jury question whether a fraud had been committed, they are no evidence of the waiver and estoppel urged by appellant. All of these matters would have been material, had this been a suit to rescind, instead of a suit which affirms the contract, and, in effect, seeks damages for its breach.

Some confusion has been created by a loose observance of the distinction between rescinding and suing for damages. The case of *Minnesota Thresher Mfg. Co. v. Gruben*, 6 Kan. App. 665 (50 Pac. 67), is illustrative. It makes the general declaration that, if one buys a threshing machine represented to be new, which is, in fact, old, repaired, and repainted, and this is discovered by the buyer within three days, and he thereafter makes payments without objection, the fraud in the sale is waived, and there was no ground for the recovery of damages. But the case rests on *Weybrich v. Harris*, 31 Kan. 92 (1 Pac. 271), which holds that "a purchaser cannot retain and use property, and at the same time say he repudiates and rescinds the contract of purchase;" that his only remedy is to rescind *in toto*. One rule controls in actions to rescind. Another governs cases "where, while accepting the fruits of a contract, one seeks to recover damages for fraud inducing it, whereby his benefits under

18. FRAUD: affirmance of fraud-induced contract as bar to damages.

it are lessened or destroyed." If there be no rescission, the defrauded party has, after discovery, the right to secure all the benefits that could come from his contract; and, if they were less than the consideration paid, an action at law for damages can be maintained for the deficit. *Van Vliet F. Auto Co. v. Crowell,* 171 Iowa 64, citing *Coe v. Lindley,* 32 Iowa 437. Affirmance of the contract does not waive the fraud, nor bar the right to recover damages, but bars a subsequent rescission, merely. *Van Vliet v. Crowell,* 171 Iowa 64; 9 Cyc. 432; *McKinley v. Warren,* 218 Mass. 310 (105 N. E. 990). Affirmance of the contract, standing alone, is no waiver of the fraud by which it was induced. *Whiting v. Price,* 172 Mass. 240 (51 N. E. 1084). And the case of *St. John v. Hendrickson,* 81 Ind. 350, does not more than this for the appellant. It holds that affirmance *with more* may work a waiver. That not more is intended is evidenced by the statement, "We neither hold nor mean to hold that affirmance by retention of the thing bargained for cuts off an action for damages." It is said, in *Edwards v. Roberts,* 7 Smedes & M. (Miss.) 544, that the making of a new engagement or agreement abandons nothing but the right to *equitable* relief.

The case of *Thompson v. Libby,* 36 Minn. 287 (31 N. W. 52), has its own way of pointing out the distinction. It holds that, if the fraud be discovered before the contract is performed, the victim must decide whether he will go on or rescind; that he may not say it is a good contract for enabling him to accept the property, but not binding on him as to the price to be paid. This is another way of saying that the party saves rights if he affirms which he may not assert if he rescinds.

As said, *Van Vliet v. Crowell* points out the distinction. It is made plain in *Rice v. Friend,* 179 Iowa 355, wherein we held that, though an attempt was made to rescind, and the same became abortive, and though paint

bought was used after fraud in representing its quality was discovered, and though it was known that the paint injured what was painted, that this constituted a bar to rescission; but that the right to sue for damages to the amount of the difference between the value of the paint as represented, and as it actually was, had not been lost. We take it that *Fairbanks v. Baskett,* 98 Mo. App. 53 (71 S. W. 1113), is cited by appellant merely because it contains the words, "at least, if the purchaser makes timely objection." Surely, nothing else in it avails the appellant; for it holds squarely that retaining the property after knowledge that it was imperfect, and giving notes, then, does not work a waiver, because making the notes was simply a compliance with the purchaser's contract, and no more deprived him of redress than payment of the price in cash would have done.

This will be elaborated when we come to deal with other acts of the defendant claimed to work a waiver and estoppel.

VIII. The things to which we have referred, including payment, are no bar. It follows that counterclaiming for damages is none; for such plea has precisely the effect of pleading payment of the contract obligation. *Carroll v. Rice,* Walker's Chan. (Mich.) 374; *Ranney v. Warren,* 13 Hun (N. Y.) 11; *Smith v. Werkheiser,* 152 Mich. 177 (115 N. W. 964); *Coe v. Lindley,* 32 Iowa 437. And, as we shall presently see, no performance of the contract on part of the vendee bars the right to claim damages, if such performance is merely an acknowledgment that the contract shall be treated as effective because the defrauded party has elected to forgive the fraud that induced the contract.

19. SET-OFF AND COUNTER-CLAIM: nature and grounds.

A much closer question than any to which we have adverted arises from the fact that defendant asked and ob-

tained an extension of time wherein to make his payments. There are cases holding that asking a change in terms which is refused is no bar. See *Parks v. Burbank,* 58 Iowa 707; *Jacobsen v. Whitely,* 138 Wis. 434 (120 N. W. 285); *Brustman v. Dunn,* 161 Wis. 306 (154 N. W. 361). Of course, that does not aid the appellee, because here the extension asked was granted. The case of *Edwards v. Roberts,* 7 Smedes & M. (Miss.) 544, rules that seeking or obtaining such new engagement or agreement abandons claim to *equitable* relief. But it has frequently been held that, in certain circumstances, obtaining such an extension or another favor to which the vendee is not entitled of right, works a ratification, and bars the right to recover damages. See *Doherty v. Bell,* 55 Ind. 205 (but it involves no fraud); *Wylie v. Gamble,* 95 Mich. 564 (55 N. W. 377); *Blydenburg v. Welsh,* 1 Baldw. 331, 338. According to *Negley v. Lindsay,* 67 Pa. 217, *Schmidt v. Mesmer,* 116 Cal. 267 (48 Pac. 54), *Pryor v. Foster,* 130 N. Y. 171 (29 N. E. 123), and Bigelow on Fraud (1st Ed.) 184, there is a bar if a new engagement or agreement be merely sought. But we have no doubt that the cases of this class have, whether they express it or not, been decided on a confusion between rescission and affirmance.

But there is no difficulty in reaching the conclusion that the asking and obtaining of an extension of time or of change in terms of payment is not bar to a suit for damages, if one will keep in mind the distinction between rescinding and affirming,—if due consideration be given to what the affirmance of such a contract really is. Where one denies the validity of a contract, he cannot persist in that position, if he asks a change in its terms advantageous to himself. So doing is utterly inconsistent with the position that there is no contract. But if one have rights if there be a valid contract, and treats the contract as being valid, there is no inconsistency in asking betterment of its

terms. And if one has entered into what he acknowledges is a binding contract, though he might have maintained that it was not, he certainly has the right to sue to recover for a breach of that contract. At the outset, it is the one who has been defrauded that has the right to elect whether he will rescind or will affirm. As said in *Shuttlefield v. Neil*, 163 Iowa 470, one who is guilty of fraud and deceit in effecting an exchange in lands cannot complain that his victim elects to sue at law for damages, instead of going into equity for rescission. Starting, then, with this right, the case is made clear by appreciating that, when there is an election to affirm a contract, the fraud that induced making it is no longer of any effect, and the contract becomes a valid one by the election of the defrauded party. He has then no rules to contend with which do not apply to a concededly valid contract. When he demands damages for the antecedent fraud, he is merely declaring upon the breach of a valid contract. Any breach must be responded to, even though the one suing for breach has succeeded in getting the contract amended to his betterment. The only effect of the change is that the breach must be declared on the contract as amended. The effect of it all is that the defrauded party says:

"You have defrauded me, and I have the right to rescind, but I will not exercise it. I will treat the contract as a good contract, and I will perform it precisely as though it had never been tainted with fraud. But I demand of you that you also carry out the contract; that you give to me what you agreed to give. I am retaining the property. Therefore, your agreement can be effectuated only by your paying to me the difference between the property I have been given and the one that I would have had if it had corresponded with what you represented to me I should have."

Had there been no fraud, certainly it would work no

relinquishment of any kind that the purchaser made the payments he had agreed to make, or that he had the terms of the payments amended. In the supposed case, it certainly would work no prejudice to the buyer that he improved the property bought. All such acts are but a recognition that the contract is operative and unchallenged. It is said in *Sell v. Mississippi River Log. Co.*, 88 Wis. 581 (60 N. W. 1065), and on the authority of *Whitney v. Allaire*, 1 N. Y. 305, 311, 312:

"If a party affirms a contract with knowledge of the fraud, he affirms it wholly," but not "as a contract made in good faith." He "does not thereby * * * waive his claim for the damages arising from a fraud."

The one who elects to retain the property exercises an election that belongs to him, and not to the seller. He is not bound to rescind, and thus relieve the wrongdoer from an obligation to furnish land worth as much as the seller represented it to be. If that be not so, if one buy because he believes a representation that property is worth $1,000 more than he paid for it, then, though it is the duty of the seller to give him property worth that sum, with the probability of making that profit, when the buyer exercises his own right to forgive the fraud and treat the contract as valid, such forgiving releases the wrongdoer from giving what he agreed to give, and so the innocent party is compelled to take less than was contracted for. He must pursue rescission, or else place the dishonest seller in the same position he would have been in, had he not been dishonest.

The case of *Gunther v. Ullrich*, 82 Wis. 222 (52 N. W. 88), is illuminative. It holds that, where the representation consists of a false location of land sold, the plaintiff can recover the difference in value between the lots he actually got, and other lots of greater value which he was led to suppose he was getting. On the authority of *Krumm*

*v. Beach,* 96 N. Y. 398, 407, it was said in *Pryor v. Foster,*
130 N. Y. 171 (29 N. E. 123) :

"The plaintiff had the right to make as good a bargain
as he could, and was entitled to the full benefits thereof."

The affirmance means that plaintiff has elected to abide
by the contract, to retain the property bought, and to make
the best of what he could under the contract, and then to
recover the difference between what he received and what,
in fair dealing, he should have had.

### 8-a

If acts that but affirm the contract deprive the buyer
of the recovery of damage due to the fact that he had not
received what he had bargained for, the rule that he may
elect to rescind or may affirm would be meaningless.   It
is said in *Ponder v. Altura Farms Co.,* 57 Colo. 519 (143
Pac. 570), *Grymes v. Sanders,* 93 U. S. 55, and *McLean v.
Clapp,* 141 U. S. 429 (12 Sup. Ct. Rep. 29), that, if the de-
frauded party be silent, and continue to treat the property
as his own, he will be held to have waived the objection, and
to be as conclusively bound by the contract as if no mistake
or fraud had occurred.   We agree that acts of affirmance
may work on rescission such result.   But if silence or af-
firmative acts treating the contract as valid bar damages
for fraud, if the fact that, after knowledge, the wrongful
party performs and manifests an intention to abide by the
contract works a condonation, what becomes of the right to
elect?   Since the right exists, how can it be claimed that
the sole remedy is rescission, or its equivalent, cancella-
tion; that the rule in cases of affirmance operates only if
there be no affirmance?

### 8-b

The holding of *Reger v. Henry,* 48 Okla. 759 (150 Pac.
722, 725), does not aid appellant, for it holds that tender-
ing a large payment after knowledge of the fraud does not
work a waiver, because the buyer had the election whether

to rescind or go on with the contract, and that, therefore, the payment was simply a declaration of intention to go on. We take it appellant cites this case because it announces the general and unquestionably sound rule that there is a waiver of the fraud if one, by act and conduct, intends to waive. This comes to no more than a holding that, in some cases, the question of whether fraud has been waived is a question for a jury. That is undoubtedly true. But it does not follow that, where one having an election to rescind or to affirm a contract does some act which is in line with affirmance thereof, that it is for a jury to say whether such acts show an intention to waive the fraud.

A line of cases relied on are not wholly applicable, because no fraud is involved in them. Such is *Doherty v. Bell*, 55 Ind. 205, in which the waiver was found from an extension given by the endorsee. In *Aultman & Co. v. Wheeler*, 49 Iowa 647, no fraud being involved, it was held that the renewal of a note is presumptive evidence of a waiver of breach of warranty. In *Keyes v. Mann*, 63 Iowa 560, the new note held to be enforcible was given to settle a claim for shortage in land sold, and the right to recover independently on the shortage was denied. In *McKinley v. Warren*, 218 Mass. 310 (105 N. E. 990), it is held that taking the note of a third person in settlement of a claimed fraud will not, as matter of law, bar a suit for damages, which is but a holding that, in that sort of case, the issue of waiver should not have been withdrawn from the jury.

We find nothing relevant in *Smith v. Burns B. & Mfg. Co.*, 132 Wis. 177 (111 N. W. 1123); *Hunter v. French L. S. C. Co.*, 96 Iowa 573; *Stearns v. Lawrence*, 83 Fed. 738, 740; *Currie v. Continental Casualty Co.*, 147 Iowa 281; *McCormick v. Orient Ins. Co.*, 86 Cal. 260 (24 Pac. 1003); *Washburn v. Union Cent. L. Ins. Co.*, 143 Ala. 485 (38 So. 1011); and *Schuetz v. International Harv. Co.*, 167 Iowa 634.

IX. Appellant contends the answer raises no issue on

the question of fraud, and, indeed, raises no issue.  If that be so, it was as apparent when the answer was filed as it is now.  It was not challenged, and its sufficiency may not be raised here for the first time.  This has been decided so frequently that we will not indulge in citation.

20. APPEAL AND ERROR: sufficiency of pleading.

X.  Other matters urged need no extended consideration, either because what has been said covers them, or because they are not presented in rule manner.

We find no prejudicial error, and the judgment below is, accordingly,—*Affirmed*.

LADD, C. J., EVANS and PRESTON, JJ., concur.