MATHEWS, Justice.
This is an appeal from what is termed a final decree in a suit by the appellant for an accounting.
In an amended answer and counterclaim the appellees admitted that they were due the appellant certain sums .of money which he claimed to be due in his bill of complaint, but in their counterclaim, appellees asserted that they had been compelled to pay out large sums of money in excess of the amount due by them to the appellant because he had furnished to them a financial statement of the affairs of the corporation and they had entered into a contract to purchase stock in the corporation in reliance upon.such financial statement which they alleged was “inaccurate.” The appellees admitted that they owed the appellant the sum of $15,000, but claimed that because said financial statement was inaccurate “they had paid amounts over and above those shown to be required by such financial statement in excess of the sum of Fifteen Thousand Dollars ($15,000.00) * * The counterclaim contained the following prayer:
“Wherefore defendants seek and pray for affirmative relief and that an accounting be had under the direction of this Court to determine what amount or amounts of money, if any, are owing these defendants or either of them, by the plaintiff in excess of the sums that may be shown to be due him and to enter its judgment accordingly.”
The appellant filed an answer to the counterclaim of the appellees in which he denied that the financial statement was inaccurate and that he owed the appellees anything.
It appears from the testimony and the record in this case that Street, the appellant, owned the controlling stock in Bartow Growers Processing Corporation, and J. E. Butler and G. A. Lamb, the appellees, desired to purchase the corporation, or the •controlling stock therein. Butler and Lamb were not residents of Florida but bad made a success in the financial world in Chicago and other places and apparently were possessed of considerable money. Butler and Lamb, after some correspondence with appellant, and prior to the 6th day of April, 1950, came to Florida. They inspected the plant for some time prior to April 6, 1950, and offers were made back and forth with reference to the purchase of the stock owned or controlled by Street, of the corporation. On April 6, 1950, they agreed upon a contract of purchase and sale of the stock which was reduced to writing and on that date they paid to Street a binder of $600, which was called for in the contract. The contract was executed on April 6, 1950, and called for the further payment of $17,-900 in the closing of the purchase and sale of the stock, not later than May 25, 1950.
The contract made no provision for Butler and Lamb to take over the operation of the plant until May 25, 1950. However, for some reason, not fully disclosed by the' record, they took over the plant with the full knowledge, consent and acquiescence of' the appellant and took over the' immediate control and operation of same on April 6, 1950. This fact shows that the appellees Butler and Lamb were very anxious to take' over the plant.
After taking over the plant, the appellees employed the appellant, at a salary of $300 per week, to stay on with them and to assist 'them in securing the fruit, operating the plant and to perform other duties.
•After identifying the parties, the shares of stock involved, recitals of obligations of the appellant Street, which the appellees agreed to assume and pay, the agreement contained the following statements:
“And Whereas, this agreement is entered into by Vendees based upon the financial statement of the Corporation as of March 31st, 1950, and the representations made as to the present financial condition of the Corporation by Vendor,
*230 “Now Therefore, for and in consideration of the mutual covenants herein contained the Vendor and Vendees agree as follows:
******,
“d) Vendees will cause to be paid to C. G. Street by the Corporation the additional sum in cash of $15,000.00 as balance of cash to be paid Vendor for said 83,500 shares of stock as follows: Beginning April 1, 1950 the corporation will pay to C. C. Street per gallon on all juice concentrate processed during the balance of the current processing season to apply on such indebtedness, such payments to be made weekly by the Corporation, and Vendor to have access to the books of the Corporation on application to check the gallonage processed weekly; if any balance remains due on said $15,000.00 at the end of the current processing season, such balance shall be paid beginning the first week of the next ensuing processing season on the same basis and at weekly intervals until fully paid; or in the event the said C. C. Street shall be successful in enducing Mojonnier Bros. Co., a corporation with principal offices at Chicago, Illinois to forego installment payment on machinery sold by them to the Corporation for the balance of the Current processing season and- until the beginning of the next ensuing processing season, then the Vendees agree said Corporation shall pay on the said $15,000.00, 2>‡ for each gallon of Citrus Juice Concentrate processed during the current, and next ensuing processing season, instead of the 1%^ as aforesaid.
* * * * # *
“* * * should Vendees fail and refuse to make the payment of $17,900.00 as aforesaid, by May 25th, 1950, then and in this event the Vendor may at his election retain the $600.00 this day paid, and Vendees shall ■ forfeit at his election said $600.00, and the Vendor may thereupon reacquire full ownership of such 83,500 shares of stock and have same re-issued in his name or in his name and designees, upon repayment to the Corporation of any gallonage payment received by Vendor to that date, or set off against the Corporation indebtedness to the Vendor, at the Vendor’s election.”
It is shown by the record that the appel-lees have been in full possession, control and operation of all affairs of the corporation since April 6, 1950, and that the deal was finally consummated, as called for by the contract of sale and purchase, on May 25, 1950.
It is undisputed that the appellees knew of all claims, involved in their counterclaim, due to any “inaccuracies” in the financial statement prior to May 25,-1950, except one item for $4,400 which was brought into the case a few days before the closing of the testimony. The inaccuracy of this item of $4,400 was disputed and the Chancellor made no finding with reference to the same. Therefore, this item may be eliminated from any further consideration in this opinion.
On September 22, 1950, the appellees gave to the appellant what purports to be a full statement of account between the ap-pellees and the appellant in a letter, the concluding paragraph of which is as follows :
“The balance due, as shown above, will be paid in weekly settlements at the rate of per gallon of concentrate produced at our Bartow plant. It is quite possible that we may elect to liquidate the balance due you under this agreement in a cash settlement within the near future.”
On April 24, 1951, over a year after the appellees took possession and control of the property, in response to a written request for an accounting between the parties, the appellees gave an accounting to the appellant in the form of a letter as follows:
“Mr. C. C. Street,
P. O. Box 1443
Winter Haven, Florida.
“Dear Mr. Street:
“Mr. Butler turned your letter of April 23 rd over to me to answer, and listed below is a statement of the account to date. *231 On the salaried account, there is a balance of $1,714.14 and the note account balance is $6,714.18.
Balance 1/1/15 Balance 1/1/51
Payments $5,794.86 Payments $10,794.89
1/4 879.88 1/4 878.88
1/10 235.61 1/10 235.60
1/18 348.36 1/18 348.36
1/22 294.23 1/22 294.22
1/29 285.75 1/29 285.75
2/6 407.70 2/6 407.70
2/13 503.28 2/13 503.28
2/20 489.10 2/20 489.11
3/6 637.81 4,080.72 3/6 637.81 4,080.71
$1,714.14 $6,714.18
“We have been running mostly in bulk, but beginning this week, we should run in grade, and will start making these payments again in the very near future.
“Trusting everything is O. K. with you,
“Yours very truly,
■Bartow Growers Processing Corporation
(Signed) T. M. Allen
T. M. Allen.”
It is significant that although the uncon-tradicted testimony shows that the appellees know, or claimed to know, of the alleged inaccuracies prior to May 25, 1950, they did not advise the appellant of any such claims or inaccuracies in either of the statements of account hereinabove mentioned.
On October 23, 1951, the appellant called to the attention of the appellees the fact that he claimed there was then due him $15,000. In response to this letter the ap-pellees for the first time advised or notified the appellant that they were making some claims against him because of “inaccuracies” in the financial statement which he had furnished on March 31, 1950. In this letter the appellees further notified the appellant that they declined to pay the sums due to him and threatened “in the event you wish to take legal action, we shall seek to recover these sums from you.” Meaning the sums which they claimed were not set forth in the financial statement due to “inaccuracies”. From the time the appellees took possession, control, operation and management of the plant, on April 6, 1950, until the entry of the final decree, there was no claim asserted by the appellees that the appellant had been guilty of misrepresentation, fraud, or deceit, for which he would be liable and the first time any, claim of even an omission in the financial statement was set forth was in the letter of November 28, 1951, and it was claimed that such omission was due to “inaccuracies.” In all of the testimony given by the appellees they do not claim any misrepresentation, fraud, or deceit, which would entitle them to recover any items set forth . in their counterclaim.
Even if there were misrepresentations contained in -the financial statement, the appellees are now estopped' to assert them. When the appellees first ascertained that there were “inaccuracies,” they could have brought an action to rescind the contract. They failed to do so. At the time the appellees gave an accounting to the appellant on November 22, 1950, and again on April 24, 1951, they may have bad a right to assert their claims because of the “inaccuracies” of which they then had actual knowledge. This they failed to do. They waited until they had been in possession of the property and enjoying the fruits thereof for more than 18 months before they even attempted to assert any claim or to give any notice to the appellant that they had any claim.
. The undisputed evidence in this case shows that the appellees not only should have known, but did actually know, of any claimed inaccuracies or omissions in the financial statement and “having such knowledge, they cannot claim they were deceived in relying upon the representations at the time they consummated the contract on May 25, 1950.” McDonald v. Rose, Fla., 50 So.2d 878, 879; Fote v. Reitano, Fla., 46 So.2d 891; Williams v. Penn Mut. Life Ins. Co., 5 Cir., 27 F.2d 1.
It is claimed that the failure of the appellees to know all about the business or to investigate the business was due to the fact that they were nonresidents of the State, were not citrus processing men, and *232 did not have sufficient time and opportunity to examine into and discover the financial condition of the corporation before entering into the contract of April 6, 1950. There is no merit in this contention. They were experienced business men. They had accummulatcd considerable wealth. They desired to purchase this plant, were on the ground several days before the purchase agreement of April 6, 1950, had access to and did examine the plant, and before the contract of purchase was consummated on May 25,1950, they had actual knowledge of the claimed inaccuracies. Market conditions were changing. Citrus seasons come and go. Conditions, seasons and prices vary from day to day and from week to week and season to season. The party claiming fraud, misrepresentation or deceit cannot sit idly by and wait until conditions suit him to put the other party on notice or to take action with reference to rescission of a sales contract, or to claim damages because of a claimed inaccurate financial statement. Brite v. W. J. Howey Co., 5 Cir., 81 F.2d 840; Realty Securities Corporation v. Johnson, 93 Fla. 46, 111 So. 532.
In view of the conclusion which we have reached, it is unnecessary to consider or pass upon other questions presented in this appeal.
Reversed, with directions to set aside the final decree and proceed further in accordance with this opinion.
ROBERTS, C. J., and TERRELL, SE-BRING and DREW, JJ., concur.
PARKS, Associate Justice, dissents.